1    Kevin B. Collins (admitted pro hac vice)
2    Jeffrey M. Davidson (SBN 248620)
     Winslow B. Taub (SBN 233456)
3    COVINGTON & BURLING LLP
     One Front Street, 35th Floor
4    San Francisco California 94111-5356
     Telephone:  (415) 591-6000
5    Facsimile:  (415) 591-6091
     Email: kcollins@cov.com
6           jdavidson@cov.com
7           wtaub@cov.com

8    Attorneys for Plaintiff and Counterdefendant MYSPACE, INC., and
     Third-Party Defendant and Counterclaimant FOX AUDIENCE NETWORK, INC.
9

10                      **UNITED STATES DISTRICT COURT**
11                     **NORTHERN DISTRICT OF CALIFORNIA**

12

13                                          |  **Case No. C 10-00604 CRB**
14                                          |  **Case No. C 10-01156 CRB**
                                            |  **Consolidated Actions**
15   MYSPACE, INC.,                         |
16                Plaintiff and Counterdefendant,  |  **MYSPACE, INC.'S AND FOX**
                                            |  **AUDIENCE NETWORK, INC.'S NOTICE**
17        vs.                               |  **OF MOTION AND MOTION FOR**
                                            |  **SUMMARY JUDGMENT OF**
18   GRAPHON CORPORATION,                   |  **INVALIDITY OF U.S. PATENT NOS.**
                                            |  **6,324,538; 6,850,940; 7,028,034; AND**
19                Defendant and Counterclaimant.  |  **7,269,591**
20                                          |
                                            |  DATE:  Friday, July 2, 2010
21                                          |  TIME:  10:00 a.m.
                                            |  COURTROOM:  8, 19th Floor
22                                          |  JUDGE:  Honorable Charles R. Breyer
23

24

25

26

27

28   MYSPACE AND FAN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
     Case Nos. C 10-00604 & C 10-01156

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 2, 2010, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Charles R. Breyer, United States District Judge, at the United States District Courthouse, San Francisco, California, Plaintiff MySpace, Inc. and Fox Audience Network, Inc. ("MySpace") will move and hereby do move for an order granting summary judgment under Rule 56 of the Federal Rules of Civil Procedure that each claim of each of the patents-in-suit is invalid as anticipated or obvious under 35 U.S.C. §§ 102 and 103.

This motion is based on this Notice of Motion and Motion, and Memorandum of Points and Authorities in Support Thereof; the accompanying declarations of Oliver McBryan, Ph.D. and Winslow Taub and exhibits and appendices thereto; the pleadings and papers on file herein; and any other matter that may be presented at the hearing.

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ............................................................................ vi

ARGUMENT ......................................................................................................... 1

I.      Introduction ................................................................................................ 1

II.     Factual Background .................................................................................... 2

     A.     The Asserted Patents .......................................................................... 2

     B.     The Mother of All Bulletin Boards ..................................................... 5

     C.     The World-Wide-Web Worm (WWWW) and WAIS ........................... 10

     D.     Current Operating Version of the MBB and WWWW ......................... 11

III.    Legal Standards ......................................................................................... 11

     A.     Legal Standard for Summary Judgment .............................................. 11

     B.     Legal Standards for Invalidity .......................................................... 11

IV.    The MBB Is Prior Art ................................................................................ 12

V.     Claim Construction .................................................................................... 13

VI.    Invalidity Analysis of Asserted Patents ....................................................... 13

     A.     The MBB Invalidates the '538 Patent ................................................. 14

          1.     The MBB Created Database Entries Containing Text, URLs, Images, and Categories Provided by the User ........................................... 14

               a)     The MBB Stored Entries in a Database ........................................ 15

          2.     The MBB Generated a Transaction ID Associated with Each Entry ........ 16

          3.     The MBB Password Protected the Entries ................................................. 16

          4.     The MBB Displayed the Entries in Accordance With a User-Selected Categories ................................................................................. 16

          5.     The MBB Presented the Entries in HTML in Response to a User Request ...................................................................................... 16

          6.     The MBB Anticipates or Renders Obvious the Remaining Claim Limitations of the '538 Patent .......................................... 17

a)     The MBB Renders Obvious the Charging Limitations of the '538 Patent (Claims 2 and 3).................................................. 17

b)     The MBB Anticipates the Searching Limitations of the '538 Patent (Claims 5-8).............................................................. 17

c)     The MBB Anticipates the Data Entry Limitation of the '538 Patent (Claims 4-6)............................................................. 18

B.    The MBB Invalidates the '940 Patent.................................................... 18

1.    The MBB Received Requests from Users to Add Entries and Stored Those Entries in its Database ........................................ 19

2.    The MBB Received "User Authorization Information," and it Would Have Been Obvious to Use This Authorization Information to Determine Whether a User Could Add a Record ................................ 19

3.    The MBB Stored an Identification of the User Who Created the Record, Indicating That the User Has Authority to Modify the Record.................................................................................. 20

4.    The MBB Anticipates or Renders Obvious the Remaining Claim Limitations of the '940 Patent.................................................... 21

a)     The MBB's Entries Satisfy the "Non-Textual Content," "Image," and "Included in a File" Limitations of the '940 Patent (Claims 2-4 and 9-11) ...................................... 21

b)     The MBB Anticipates the "Description of Information" Limitation (Claims 5 and 12)...................................... 21

c)     The MBB Displayed the Information Submitted on a Web Page (Claims 6-7 and 13-14) ...................................... 22

5.    Claims 15-21 Have Conclusively Been Held Invalid.............................. 22

C.    The MBB Invalidates the '034 and '591 Patents ................................. 22

1            1.      The MBB Used a Web Server Containing a Network-Accessible

Database .................................................................................................. 23

2.      The MBB Contained an HTML Front-End Entry Process That

Permitted Users to Create and Store Personal Homepage Data .............. 23

3.      The MBB Indexed Entries in User-Defined Categories ........................... 23

4.      The MBB Renders Obvious the "Receiving a Fee" Limitations .............. 23

5.      The MBB Anticipate the "Updat[ing]" Limitations in the

Independent Claims of the '034 Patent...................................................... 24

6.      The MBB Satisfies the Remaining Dependent Claim Elements .............. 24

a)      The MBB Allowed a User to Supply Keywords for an

Entry ('591 Patent, Claims 5-10, 16-20)....................................... 24

b)      The Remaining Claim Elements of the '034 and '591

Patents Are Subject to the Same Analysis Set Forth Above......... 25

VII.    Conclusion ...................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.*,
    731 F.2d 831 (Fed. Cir. 1984)...................................................................................11

*Glaxo Inc. v. Novopharm Ltd.*,
    52 F.3d 1043 (Fed. Cir. 1995)...................................................................................11

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).........................................................................................................12

*Great Atl. & Pac. Tea Co.* v. *Supermarket Equip. Corp.*,
    340 U.S. 147 (1950)....................................................................................................12

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005).................................................................................12

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..............................................................................................12, 20

*Mendenhall v. Barber-Greene Co.*,
    26 F.3d 1573 (Fed. Cir. 1994)...................................................................................22

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003).................................................................................11

**FEDERAL STATUTES**

35 U.S.C. § 102(b) ...........................................................................................7, 11, 12, 13

35 U.S.C. § 103 ..............................................................................................................6, 12

**RULES**

Fed. R. Civ. P. 56 ...........................................................................................................6, 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## <u>SUMMARY OF THE ARGUMENT</u>

The four patents asserted in this case by GraphOn Corporation, which all arise from an identical written description, relate to an online system that (1) allows users to submit information to a database, (2) permits users to entirely control the content and classification of that information, and (3) publishes that information to other users.  The purported invention of the patents was distinguished over prior art information systems because "[t]he present invention, generally speaking[,] uses a computer network and a database to provide a hardware independent, dynamic information system *in which the information content is entirely user-controlled*."  The first patent application giving rise to the asserted patents was filed on December 14, 1995.  But "more than one year prior to the date of the application," the purported "invention was . . . in public use or on sale in this country"— the patents are therefore invalid. 35 U.S.C. § 102(b).

Specifically, the undisputed and undisputable facts show that by April 1994, Oliver McBryan, a professor at the University of Colorado, had a system up and running on the University of Colorado's web servers, and that system, which was in widespread public use long before the asserted patents were filed, provided nearly identical functions to those of the asserted patents.  Indeed, Professor McBryan presented a paper on the system at the first World Wide Web Conference in Geneva, Switzerland in May 1994.  *See* McBryan Decl. Ex. C.  The system, aptly named "The Mother of All Bulletin Boards," permitted users to create web-based entries of information, containing information entirely controlled and classified by the users, which were then republished to other users over the internet.  *See* McBryan Decl. Ex. R (MBB Video) [1] at 0:52-5:07.  Thus, the supposed point of novelty of the asserted patents was not novel at all, and thus all of the claims of the asserted patents are invalid.  Accordingly, MySpace respectfully requests entry of summary judgment of invalidity.

---

[1] Citations to the videotape of Professor McBryan, which is discussed in further detail herein, are to the time stamp on the video.

1

<u>**ARGUMENT**</u>

**I.      Introduction**

Each of the patents asserted in this lawsuit by GraphOn Corporation ("GraphOn") claims variations on a single idea, which is not technologically complex:  an online database system that stores user-entered content and then displays it to other users in exactly the form it was entered. But the Mother of All Bulletin Boards, in public use at the University of Colorado more than a year before the patents were filed, already anticipated or rendered obvious every asserted claim.

The MBB, developed by Professor Oliver McBryan, a pioneer in the development of the internet, was a web-based virtual "bulletin board" that permitted users from around the world to submit bulletin board entries that other users could access.  The MBB software allowed users to create "entries"—web pages—and place them into existing categories on the bulletin board, or to create new categories or subcategories as needed.  Each entry was password protected, and included an image, a title, and a "body" of text.  The body of the entry could contain plain text, web links, images, URLs, or any other content that could be expressed in the internet's main programming language, hypertext markup language (HTML).  All of the entries in the MBB were created by users, without editorial control by Professor McBryan or anyone else.  Indeed, by the time Professor McBryan presented his paper to the World Wide Web Conference in May 1994, users had already employed Professor McBryan's system to create numerous bulletin board entries, which had been accessed more than 100,000 times.  McBryan Decl. Ex. C, at 82.

The MBB employed two search engines, one of which was developed by Professor McBryan.  The principal search engine, embedded in the MBB, was named the World Wide Web Worm (WWWW).  The MBB also contained a link to another search engine called WAIS, which was regularly employed by users to search the MBB as well.  The search engines allowed users to perform keyword searches of the categories, subcategories, and entries of the MBB to find entries relevant to them.  McBryan Decl. Ex. C (MBB Paper) at 81 ("The [MBB] pages include a pointer to WWWW so that a user who cannot locate a resource in the virtual library can try a keyword search for it.").  In May 1994, Professor McBryan presented a paper to the first World Wide Web Conference describing the operation of the MBB and the search engines.

Professor McBryan has created a working version of the MBB software using the original source code for the MBB, modified (without any functional alteration) to operate on a modern computer. That source code documents to the letter the functionality of the MBB as it existed in 1994, prior to the filing of the patents-in-suit. To assist the Court in fully appreciating the capabilities of the MBB, MySpace has prepared a video demonstration of the MBB, narrated by its creator, Professor McBryan. McBryan Decl. Ex. R. Additionally, a working version of the MBB can by accessed by the Court at http://mbb.hopto.org/~mcbryan/bbn2/summary.html.[2] Finally, Professor McBryan has prepared a declaration describing the functionality of his MBB and how the MBB matches up to the claims of the patents-in-suit. *See* McBryan Decl. & App'x A. Where minor differences exist between the asserted patent claims and the MBB, the simple changes to the MBB needed to conform to the patent claims would have been obvious to a person of ordinary skill in 1994. Indeed, as Professor McBryan explains in his declaration, such changes would often only require one or two lines of code and would have entailed well known computer techniques. *See, e.g.*, McBryan Decl. ¶¶ 27, 49.

Because there is no dispute that the MBB was in public use more than one year before the filing date of the patents, and because the MBB functions in the same manner as the inventions claimed in the patents-in-suit, the Court should grant summary judgment and find that the MBB anticipates or renders obvious every claim under any reasonable construction, and find the patents invalid.

## II.    Factual Background

### A.    The Asserted Patents

Defendant GraphOn has accused plaintiffs MySpace, Inc. and Fox Audience Network, Inc. (collectively, "MySpace") of infringing four patents: U.S. Patent Nos. 6,324,538; 6,850,940; 7,028,034; and 7,269,591.[3] Compl. ¶ 19. All four patents claim priority to an

---

[2] MySpace will supply the Court and opposing counsel with a user name and password to access the Mother of All Bulletin Boards in a separate sealed filing to prevent unauthorized access.

[3] This motion and the accompanying papers will refer to the patents by their last three numbers, e.g., "the '538 patent." Because all four patents share a common specification, we cite only to the '538 patent, citing first the column number followed by the line numbers (for example, "'538 patent, 2:11-19" refers to column 2, lines 11-19).

application filed on December 14, 1995.

The inventors tried to improve on the prior art system known as "Yahoo" which allowed users to "have their Web page listed in the Yahoo database by providing information concerning the resource they wish to list and paying a fee." Taub Decl. Ex. 1 ('538 patent, 2:11-19). But such services were "typically attended by a number of drawbacks. In particular, the person wishing to publicize their Web site typically has very limited control of the content of the resulting listing." *Id.* 2:22-25. The patents go on to explain that in the prior art systems, the search engine owners would exert "editorial control," resulting in a listing "being placed under an entirely different category from the category intended" by the user, and "the textual description may be heavily edited." *Id.* 2:28-39. Additionally, "the nature of the listing is rather prosaic. The listing is in title/brief description format and does not include graphical elements or otherwise appeal to the artistic sensibilities of the viewer." *Id.* 2:40-47.

To solve these problems, the inventors proposed an automated listing system that would permit users to exert complete control over the content and categorization of their entries, disclosing a

> dynamic information system in which the information content is entirely user-controlled. Requests are received from individual users of the computer network to electronically publish information, and input is accepted from the individual users. Entries from the users containing the information to be electronically published are automatically collected, classified and stored in the database in searchable and retrievable form. Entries are made freely accessible on the computer network. In response to user requests, the database is searched and entries are retrieved.

*Id.* Abstract, 2:61-64. Users submit a variety of types of information to the service (*e.g.*, text and graphics), which stores the information in a database. *Id.* 2:61-64; 3:19-21. The information is then made available for viewing by other users, preferably as a hypertext markup language (HTML—*i.e.*, internet) file. *Id.* at 3:3-7; 3:16-19.

Figures in the patents illustrate how the invention would work. **Figures 2L and 2M** illustrate a two-page entry form that would allow a user to submit information by filling in the blanks of the form. **Figure 2M** shows the second page of the form where a user can select a category associated with the entry. The user is also permitted to "define your own" category.

**Submit a new entry to WebWho**

Title: (The way you want your entry to appear in WebWho)
Name: (The way it appears on your credit card)
First Name: Last Name:
Middle Name:(optional)
Phone#1:
Phone#2(optional): Fax:(optional)
Address:
City: State:
Zipcode: Country:
Email:
URL#1:(optional)
URL#1:(optional)

Please enter your 20 keywords in the following text area.
Each keyword should not exceed 20 characters.
Remember to seperate each keyword by space(s).

Enter a description of your entry in the following text area.
It will be displayed along with your entry.

O - MAIN  O - SEARCH  O - ADD  O - UPDATE

FIGURE 2L

**Choose a category**

**BUSINESS**

☒ BOOKSTORE -STORE THAT SELLS BOOKS
☒ COMPUTER -COMPUTER COMPANIES.
☒ REAL ESTATE -BUYING AND SELLING
   PROPERTIES.
☒ WEDDING DESIGN -PLAN AND CORRDINATE
   WEDDINGS.

**Or define your own**

Category:

Description:

O - MAIN  O - SEARCH  O - ADD  O - UPDATE

FIGURE 2M

Finally, **Figure 2N** shows the entry that results from the process and which will be displayed to other users (also referred to as a mini homepage or personal homepage in the patents). *Id.* 6:5-13.

**ANNE HOGAN PERRY REALTOR**

Anne brings to her clients the depth of her business background
teamed with her strong commitment towards professionalism
and client satisfaction. Anne view real estate as a team effort and
partnership; her success stems from the success of her clients.
Referrals from client were the key to Anne's achievement as
Mary Worrall's Top Producer for 1994. Anne's focus areas have
followed those of her clients. From the first time home buyer to
high end sophisticated estate purchaser, all receive the same high
levels of service and enthusiasm. Anne was born and raised on
the "Gold Coast" of Oahu. Prior to moving back to Honolulu in
1993, she lived the past ten years on Maui and Kauai. Her
Kamanina background teamed with her neighbor island exposure
gives her a unique, in depth and first hand perspective on the
statewide real estate market. Anne is one of the few brokers in
Hawaii who has actively sold real estate on four islands.

Name: Perry, Anne H
Phone#1: 8087352411
Phone#2:
Fax:
Address: 4211 WALALAE AVENUE SUITE 100
City: HONOLULU  State: HI
Zipcode:96816 Country: USA

FIGURE 2N

The patent discloses that "the information content" of the entries "is entirely user controlled."  Taub Decl. Ex. 1 ('538 patent, Abstract).  Claim 1 of the '538 patent is illustrative of the claims of the four patents-in-suit and purports to claim in broad terms:

> A method of publishing information on a computer network comprising the steps of:
>
> [1] creating a database entry containing information received [*sic*] from a user of the computer network, wherein the information includes data representing text, a universal resource locator, an image, and a user-selected category;
>
> [2] generating a transaction ID corresponding to the database entry;
>
> [3] password protecting the entries;
>
> [4] displaying the entries in accordance with the user-selected category;
>
> [5] presenting the information to a user in hyper text markup language in response to a user's request.

The other claims of the asserted patents include additional details, none of which are identified as points of novelty in the asserted patents.  For instance, the remaining claims recite the use of keywords to organize the data, charging the user a fee for the creation of an entry, and searching the entries.

## B.     The Mother of All Bulletin Boards

The MBB was developed in 1993 and was fully operational by no later than April 1994.  McBryan Decl. ¶ 5 Ex. C at 82.  It ran on web servers at the University of Colorado at Boulder.  *Id.* ¶ 5.  The operation of the MBB is described in a paper by Professor McBryan, dated May 1994, entitled GENVL and WWWW: Tools for Taming the Web.  *Id.* Ex. C.  Like the specification of the asserted patents, except earlier, Professor McBryan wrote of the problems with web indexes that "are maintained and updated by one person.  Because information is not inserted directly by information providers these systems do not scale well to an Internet with millions of computers."  *Id.* at 82.  Like the asserted patents, except earlier, the MBB was designed to permit users to create entries wherein each user wholly controlled the information in the entry, the entries were placed by users into the categories (new or existing) to which they pertained, and other users would have access to the entries.  *Id.* ¶ 7, Ex. C at 82.

The MBB anticipates every element of Claim 1 of the '538 patent, and anticipates or

1  renders obvious every other claim of each of the asserted patents.  The MBB permitted a user to

2  create an entry containing precisely the information submitted by the user, including text,

3  universal resource locators, and images.  *Id.* ¶¶ 7, 10, 19.  The user could select a category to

4  place the entry into, or could create a new category or subcategory.  *Id.* ¶ 8.  Each entry was

5  assigned a unique identifier (*id.* ¶ 25), and the user could password protect the entry (*id.* ¶ 9).

6  The entries would then be displayed to other users in accordance with the categories into which

7  they had been placed, and were presented in HTML in response to a user request.  *Id.* ¶ 20.

8  Indeed, long before the asserted patents were filed, users accessed the MBB more than 100,000

9  times, creating a vast number of entries and incorporating them into the MBB hosted by the

10  University of Colorado.  *Id.* ¶ 23; Ex. C, at 82.

11      Taking these features together, the MBB, more than a year before the asserted patents

12  were filed, was capable of generating an entry literally identical to that shown in the asserted

13  patents.  *Compare* McBryan Decl. ¶ 43; Ex. G (an MBB entry mirroring Fig. 2N) *with* '538

14  patent, Fig. 2N.  Like Figure 2M of the patents, a user of the MBB could create a category

15  "BUSINESS" and subcategories "BOOKSTORE-STORE THAT SELLS BOOKS,"

16  "COMPUTER-COMPUTER COMPANIES," "REAL ESTATE-BUYING AND SELLING

17  PROPERTIES," and "WEDDING DESIGN-PLAN AND COORDINATE WEDDINGS" as

18  depicted in Figure 1 below.



**FIGURE 1**

1    Likewise, a user of the MBB could create an entry nearly identical to that depicted in

2    Figure 2N of the patent:



**FIGURE 2**

15    The MBB was organized as a hierarchy of categories and subcategories.  For instance, the

16    initial web page on the bulletin board would present a series of categories, such as "Baked

17    Goods" and "Sporting Goods."  *See* McBryan Decl. ¶¶ 8, 20; Ex. R (MBB Video) at 5:08-7:42.

18    A user could click on the category of interest, and would then see a new page containing

19    subcategories, such as "Cakes," "Bagels," and "Pies."  *Id.*  The fundamental element of the

20    bulletin board was a bulletin board entry, essentially a single web page, such as a page about

21    "Blueberry Pies," which could be accessed from the relevant category or subcategory.  *See id.* ¶¶

22    7-8.

23    A user could add an entry into any category or subcategory by navigating to the

24    appropriate page and then clicking on the "Add Entry" link.  *Id.* ¶ 12 and Ex. R (MBB Video) at

25    15:23-17:54.  Alternatively, a user could add categories or subcategories as needed.  *Id.* ¶ 8 and

26    Ex. R  (MBB Video) at 15:23-17:54.

27    For example, the user could select the category "Baked Goods" (categories were denoted

28

by ** in the MBB as illustrated in Figure 3 below) from the top level of the hierarchy.  *See id.* ¶

8 and Ex. R (MBB Video) at 15:23-16:53.



**FIGURE 3**

The user could then select a subcategory, such as "Cakes" or could create a new

subcategory by selecting "Create Bulletin Board" and typing in the name of the new

subcategory.  *Id.* ¶¶ 8, 14, 18.  For example, a user could create the subcategory "Pies" as

illustrated in Figure 4.  *See also id.*  Ex. R (MBB Video) at 15:23-16:53.



**FIGURE 4**

1    Once the user selected or created the appropriate category and/or subcategory, the user

2    would select "Input an item" to create a new entry using the following form ("Add Entry Form"):



**FIGURE 5**

12    *Id.* ¶¶ 12-14; Ex. R (MBB Video at 5:05-10:15 and 15:30-17:55).  As claimed in the asserted

13    patents, the Add Entry Form permitted a user to submit text, images, a URL, and hyperlinks to

14    be included in an entry.  McBryan Decl. ¶¶ 15-19.  The form also permitted the user to enter an

15    author name and a password.  *Id.* ¶¶ 16-17.  The categories and subcategories relating to the

16    entry were used as keywords by Professor McBryan's search engines to find the entry.  *Id.* ¶ 18.

17    Any hyperlinks would also be used as keywords by the search engines.  *Id.* ¶ 19.

18    After the user submitted the entry, the MBB would create two files.  *Id.* ¶¶ 21-22.  The

19    first file, an HTML file, which contained the viewable data submitted by the user, was stored in

20    the MBB's organized file system and was accessible to other users.  *Id.* ¶ 21.  The second file, a

21    password file, contained the password required for modifying the entry.  *Id.* ¶¶ 17, 22.  The

22    password file was not visible to other users, thus protecting the secrecy of the password.  *Id.* ¶

23    22; MBB Video at 18:25-20:12.

24    On receiving the new entry, the MBB would make it visible to other users by adding a

25    link on the appropriate category or subcategory page.  McBryan Decl. ¶ 20.  For example, if a

26    user added an entry for "Pies are not cakes" to the subcategory "Pies," a link titled "Pies are not

27    cakes" would be added to the "Pies" subcategory page.  *See id.*

28



**FIGURE 6**

## C.      The World-Wide-Web Worm (WWWW) and WAIS

Concurrently with developing the MBB, Professor McBryan developed the WWWW—one of the first tools for performing keyword searches of web pages on the internet.  McBryan Decl. ¶ 30, Ex. C.  The WWWW began its work by downloading web pages and creating an index of their "keywords," which, for MBB pages, would be the category titles pertaining to entries or hyperlinks embedded in entries.  *Id.* ¶¶ 31, 18–19.  Once the WWWW created the index, users could submit queries which the WWWW would look for in its index.  *Id.* ¶ 31.  The WWWW would then generate a web page of links to matching results, much the same as modern search engines.  *Id.*  A user could click on any of the results and be taken to the matching web page, for instance an entry on the MBB.  *Id.*

In April 1994, the MBB included a link to perform a search using WAIS.  McBryan Decl. ¶ 29, Ex C (MBB Paper) at 85 ("[MBB] supports a WAIS server, which indexes all information in the [MBB].  Thus keyword searches on topics of interest are easily performed.")).[4]  In addition, versions of the WWWW operating on the internet prior to December 14, 1994 were configured to search only the particular bulletin boards with which they were associated.  *Id.* ¶ 32.  Thus, users in 1994 could and did use WAIS or Professor McBryan's WWWW to search for

---

[4] Professor McBryan referred to his invention in academic circles as GENVL (GENerate Virtual Library), a virtual library of information and websites created by its users.  GENVL became more commonly known as the Mother of All Bulletin Boards.  *Id.* Ex. C (MBB Paper at 82).

material, indexed by keyword, within the MBB.  *Id.* ¶¶ 28-32.

**D.     Current Operating Version of the MBB and WWWW**

A currently operational version of the MBB and WWWW—which uses the original source code files for the MBB and WWWW, operating exactly as they existed prior to December 14, 1994—is located at http://mbb.hopto.org/~mcbryan/bbn2/summary.html.  The source code was changed only to account for differences in the underlying operating system and hardware in the modern computer on which the system runs.  *Id.* ¶¶ 41-42; *id.* Ex. E (listing the changes made to the source code).  This authenticated operational version of the MBB permits the Court to readily explore the elements of the prior art system and match them to the claims of the asserted patents.

**III.    Legal Standards**

**A.     Legal Standard for Summary Judgment**

The Court is well familiar with the legal standards governing summary judgment.  "Summary judgment is as appropriate in a patent case as in any other . . . . [Courts] should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources."  *Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).

**B.     Legal Standards for Invalidity**

A patent claim is invalid as anticipated if any embodiment covered by the claim was "described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," 35 U.S.C. § 102(b).  To anticipate a claim, a prior art reference or public use must disclose every feature of the claimed invention, either explicitly or inherently.  *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995).  "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003).  Summary judgment is proper if there is no genuine dispute whether the limitations of the claimed invention are disclosed, either explicitly or inherently, by

an allegedly anticipating prior art reference.  *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1380–81 (Fed. Cir. 2005).

"Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'"  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103).  In *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), the Supreme Court set out a framework for applying § 103:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.  Against this background the obviousness or nonobviousness of the subject matter is determined.

A "patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men."  *Great Atl. & Pac. Tea Co.* v. *Supermarket Equip. Corp.*, 340 U.S. 147, 152 (1950); *KSR Int'l Co.*, 550 U.S. at 415-16 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").  Indeed, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *Id.* at 417.  As shall be shown, even where Professor McBryan's MBB does not expressly disclose an element of GraphOn's patents, such differences require no more than taking well-known computer software techniques and applying them in a predictable manner.

## IV.    The MBB Is Prior Art

As discussed, the asserted patents are invalid if the "invention" of the patents was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).  Here, the first filing date of the asserted patents is December 14, 1995.  The MBB was in fact "in public use" by at least April 1994,

clearly "more than one year prior to the date of the application" of the asserted patents, i.e. prior to December 14, 1994. Professor McBryan has declared the MBB, as described in the attached video and declaration, and as available to the court at http://mbb.hopto.org/~mcbryan/bbn2/ summary.html, was in public use prior to that date. McBryan Decl. ¶ 41. Moreover, Professor McBryan published a paper describing the operation of the MBB—the date of the paper is in May 1994, amply before the earliest priority date. McBryan Decl. Ex. C (MBB Paper) at 81. The MBB Paper specifically notes that "The Mother-of-all-Bulletin Boards" was accessible on the University of Colorado's servers and had been accessed 112,003 times as of April 22, 1994 over a four month period (i.e., as early as December 1993). McBryan Decl. Ex. C (MBB Paper) at 82. Finally, Professor McBryan maintained a source code archive dating from before the key date. McBryan Decl. Ex. D (CD of MBB source code). That identical source code was used to generate the declaration, exhibits to this motion, and Figures 1-6 in this memorandum. *Id.* Ex. R (MBB Video) at 14:06-15:22; 21:30-23:52.

## V.      Claim Construction

No claim construction by the Court is necessary to address the present motion, because the MBB invalidates the asserted patents under any reasonable claim construction. For purposes of the present motion, and without prejudice to its ability to advance other claim constructions in later proceedings in this Court, MySpace relies on the broad implicit claim constructions GraphOn has advanced by accusing MySpace's and others' websites of infringement.

## VI.     Invalidity Analysis of Asserted Patents

As briefly outlined in the recitation of facts, the MBB addressed the same problem as the asserted patents, using the same techniques. Thus, the MBB anticipated or made obvious each element of the claims of the asserted patents more than one year prior to the first application date of the asserted patents. *See* 35 U.S.C. § 102(b). Additionally, Professor McBryan, in addition to being the inventor of the MBB, is also an expert in the field of web-based database systems. His curriculum vitae, which sets forth his credentials and accomplishments in this field, is attached to his Declaration as Exhibit A. In Professor McBryan's Declaration, he opines that the MBB invalidates each claim of the asserted patents. *See* McBryan Decl. App'x A (providing element-

by-element analysis of the claims of each patent).

This brief addresses the elements of the asserted patents by first demonstrating, for each asserted patent, that a representative independent claim is invalid, then addressing the variations found in the other independent and dependent claims. While the discussion here provides an overview of the reasons the MBB invalidates each claim of the asserted patents, the attached Declaration of Oliver McBryan provides a more detailed analysis of each claim element, and the attached video provides an element-by-element visual demonstration of the MBB in operation.

### A. The MBB Invalidates the '538 Patent

An illustrative claim of the '538 patent is claim 1:

A method of publishing information on a computer network comprising the steps of:

[1] creating a database entry containing information received [*sic*] from a user of the computer network, wherein the information includes data representing text, a universal resource locator, an image, and a user-selected category;

[2] generating a transaction ID corresponding to the database entry;

[3] password protecting the entries;

[4] displaying the entries in accordance with the user-selected category;

[5] presenting the information to a user in hyper text markup language in response to a user's request.

The MBB satisfies each of these elements.

### 1. The MBB Created Database Entries Containing Text, URLs, Images, and Categories Provided by the User

The MBB permitted users to create new entries without any centralized editorial control, thus anticipating what the asserted patents describe as the key point of novelty justifying patent protection. A user could submit data using the Add Entry Form. McBryan Decl. ¶¶ 12-19. An entry submitted using the Add Entry Form was placed into the MBB file system and immediately made available to the public, without modification or editorial input, exactly as the user had entered it. *Id.* ¶¶ 20-22, 24. Thus the MBB allowed a user to create an entry in a publicly accessible database.

The MBB permitted users to include in their entries any type of information—text, images, URLs, and even other information—that could be represented using the internet's main

1   programming language, HTML.  *Id.* ¶¶ 15-19.  The MBB stored data representing text.  For

2   instance, the body field of the MBB entry form accepted whatever text the user entered.  *Id.* ¶ 19;

3   Figures 3-4 *supra*.  The MBB also stored data representing URLs (Universal Resource Locators,

4   or Internet addresses).  *Id.* Ex. R (MBB Video) at 10:00-11:10; Ex. N.  Users frequently stored

5   URLs in both the title and body fields of the MBB entry form.  *Id.* Ex. B (showing screen shot of

6   historical MBB page containing a URL); Ex. C (MBB Paper) at 84 (describing use of MBB to

7   store URLs); Ex. R (MBB Video) at 10:00-11:10.  The MBB stored data representing images.

8   *Id.* Ex. R (MBB Video) at 6:06-6:59; 9:36-10:18; Ex. I.  The Add Entry Form included a field

9   specifically requesting the path of an image file to include in the entry.  *Id.* ¶¶ 12, 15.

10      The MBB associated each entry (and every piece of data within it) with a user-defined

11  category or subcategory.  As described above, in adding a new entry a user was first required to

12  select the category and subcategor(ies) for that entry, and could create a new category and / or

13  subcategory if he or she desired.  *Id.* ¶¶ 8, 12; App'x A pp. 6-12; Figures 1-6 *supra*.  Thus, every

14  entry in the MBB was associated with a category and/or subcategory, and indeed was identified

15  in the file system by the categories to which it belonged.

        **a)**      **The MBB Stored Entries in a Database**

16      The MBB stored entries in a publicly accessible database, as required by Claim 1's

17  limitation of "creating a database entry."  The files associated with each entry in the bulletin

18  board—the HTML file containing the displayable data, and the password file containing security

19  information—were stored in the hierarchal file systems of publicly accessible servers at the

20  University of Colorado.  McBryan Decl. ¶¶ 35, 24.  The file system used provided the ability to

21  organize data (files) and to perform operations such as creating, retrieving and deleting that data.

22  *Id.* ¶ 24; App'x A pp. 6-12.

23      The MBB (1) created new files in the file system when a user added an entry using the

24  Add Entry Form, (2) retrieved an HTML file from the file system when a user requested to view

25  one of the pages in the MBB, and (3) deleted files from the file system when a user deleted one

26  or more entries using the Add Entry Form.  *Id.* ¶¶ 21-24.  Thus, the MBB stored entries in a

27  public network-accessible database.

28

1

2. **The MBB Generated a Transaction ID Associated with Each Entry**

2       The MBB generated a unique identifier for each user-created entry.  Each category or

3  subcategory within the MBB was assigned a unique numerical identifier.  *Id.* ¶ 25.  For example,

4  if "Blueberry Pies" was the sixth entry in the subcategory "Pies," "Pies" was the third entry in

5  the category "Baked Goods," and "Baked Goods" was the second category in the directory, then

6  the Blueberry Pies entry would have the unique identifier "2/3/6."[5]  *Id.* ¶ 25; App'x A pp. 12-13;

7  Ex. R (MBB Video) at 7:46-9:16; 16:54-18:23.

8

3. **The MBB Password Protected the Entries**

9      The MBB protected individual entries, subcategories, and categories using a user-

10  supplied password.  As discussed, each entry was associated with a password file containing the

11  password of the user that created it.  *Id.* ¶ 22.  In addition, each category and subcategory created

12  by a user also had a password file containing that user's password.  *Id.*  Only users possessing the

13  correct password could delete an entry, subcategory, or category.  *Id.* ¶ 9; Ex. K.  Thus, the MBB

14  included the ability to password protect an entry or a group of entries created by a user.  McBryan

15  Decl. App'x A pp. 13-14.

16

4. **The MBB Displayed the Entries in Accordance With a User-Selected Categories**

17      The MBB made the submitted entries available to the public in precisely the form they

18  had been entered by the user.  After a user added an entry using the Add Entry Form, the MBB

19  added a link to the entry to the web page corresponding to the category or subcategory into

20  which it was added.  *Id.* ¶ 20.  A user could then retrieve and view the new entry by navigating to

21  that category or subcategory page and clicking on the link for the entry.  *Id.* ¶ 27.  Thus, the

22  entries were displayed in accordance with the categories selected by the user that created the

23  entry.  McBryan Decl. App'x A pp. 14-18.

24

5. **The MBB Presented the Entries in HTML in Response to a User Request**

25      As discussed, the MBB presented entries to users on request.  *Id.*  Indeed, the MBB was

26

27

---

[5] Moreover, this identifier was contained within the URL of the entry, as required by claims 5
and 8 of the '538 patent.  McBryan Decl. ¶ 25 and Ex. R (MBB Video) at 7:46-11:10.

28

able to generate an entry nearly identical to the embodiment in the patent at Figure 2M.  *See* Figures 1-2 *supra*; McBryan Decl. Ex. D.  The MBB was driven by HTML and as such the web pages generated were presented in HTML.  *Id.* ¶ 12, 13, 20; App'x A pp. 18-21.

### 6. The MBB Anticipates or Renders Obvious the Remaining Claim Limitations of the '538 Patent

#### a) The MBB Renders Obvious the Charging Limitations of the '538 Patent (Claims 2 and 3)

Claims 2 and 3 of the '538 patent require charging a user for creating the entry.  While the MBB did not require payment or accept payment information, charging for the creation of entries would have been an obvious modification of the MBB.

Leaving aside whether charging for an invention can ever be a patentable improvement over the invention itself, modifying the MBB to accept a user's credit card number in order to authorize payment would have been an obvious and straightforward task.  The technology required to do so was readily available; in fact, the web registration page for the May 1994 conference at which the MBB was presented included an internet form on which an attendee could provide a credit card number.  *See id.* ¶ 47; Ex. Q; App'x A pp. 21-22.  Moreover, the patents-in-suit admit that it was well-known in the prior art to permit users to "provid[e] information concerning the resource they wish to list" on an online database in exchange for "paying a fee."  Taub Decl. Ex. 1 ('538 patent, 2:14-19).

To incorporate the collection of credit card information into the MBB would have required two very small changes:  adding fields for the credit card information to the Add Entry Form, and adding a routine to save that information for processing.  These changes mimic the way a password was submitted and stored already, and could have been made in a few hours. McBryan Decl. ¶ 47; Exs. G, L.

#### b) The MBB Anticipates the Searching Limitations of the '538 Patent (Claims 5-8)

Claims 5-8 of the '538 patent require "searching the entries in response to a user search criterion."  As discussed above, the WWWW performed keyword searches of the entries of the MBB.  *Id.* ¶¶ 28-33; Ex. P.  Indeed, there were some instances of the WWWW that were set up to search *only* the MBB.  *Id.* ¶ 32; Ex. P.  A user performing a search using the WWWW was

presented with a list of links to matching entries in the MBB, and then could view the web page

corresponding to the entry by clicking on its link in the search results.  *Id.* ¶ 31.  Additionally,

Professor McBryan's paper notes that the MBB "supports WAIS search on its hierarchy."  Ex. C,

at 82; Ex. O.  Thus, the WWWW and MBB anticipate the "search" limitations of claims 5-8 of

the '538 patent.  McBryan Decl. App'x A pp. 41-48, 62-69.

> **c)      The MBB Anticipates the Data Entry Limitation of the '538 Patent (Claims 4-6)**

Claim 4 of the '538 patent requires that the system "presen[t] a data entry form to a user

with a plurality of categories."  The MBB provides a data entry form consisting of multiple web

pages relating to various categories, thus anticipating these claims.  McBryan Decl. ¶¶ 12–19; *cf.*

'538 patent at Fig. 2M, 6:4–7 (describing a multi-page data entry form containing a separate

"page" used to select a category); App'x A pp. 22-41.

## B.      The MBB Invalidates the '940 Patent

The claims of the '940 patent focus on the process of authorizing a user to submit an

entry and receiving a new entry from a user.  An illustrative claim of the '940 patent is claim 1:

> A method for maintaining a network accessible database on a server processing system comprising:
>
> [1] receiving a request from a client processing system connected to said server processing system over a network for a user to add a record to said network accessible database;
>
> [2] receiving user authorization information from said client processing system;
>
> [3] determining whether a user is authorized to add said record from said user authorization information responsive to receiving said user authorization information;
>
> [4] receiving said information to be included in said record responsive to transmitting said request;
>
> [5] generating said record with said information;
>
> [6] storing said record in said network accessible database; and
>
> [7] storing an identification of said user indicating said user is authorized to modify said record in said network accessible database

The MBB satisfies each of these elements.[6]

**1.    The MBB Received Requests from Users to Add Entries and Stored Those Entries in its Database**

As discussed above, the MBB "receiv[ed] a request from a client processing system connected to said server processing system over a network for a user to add a record to said network accessible database" when the user selected the option on the Add Entry Form to "Input an item" (element 1).  *Id.* ¶ 12 and Ex. R (MBB Video) at 15:23-17:54.  The Add Entry Form then provided a series of fields permitting the user to specify  information—i.e., title, text, images, URL's, etc.—to be incorporated into the MBB entry.  *Id.* ¶¶ 12-19; Ex. R (MBB Video) at 15:23-17:54.  After the user then provided the information to be incorporated into an entry and the MBB "receiv[ed] said information" (element 4), the MBB "generat[ed] said record" using "said information" received from the user (element 5).  *Id.* ¶ 21; Ex. R (MBB Video) at 15:23-17:54.  As discussed above, the entries were then "stor[ed]" "in said network accessible database" when the MBB added the entry to its hierarchical file system for later transmission to other users (element 6).  *Id.* ¶¶ 21-24; App'x A pp. 79-80.

**2.    The MBB Received "User Authorization Information," and it Would Have Been Obvious to Use This Authorization Information to Determine Whether a User Could Add a Record**

The claims of the '940 patent require "receiving user authorization information from said client processing system" and "determining whether a user is authorized to add said record from said user authorization information responsive to receiving said user authorization information" (elements 2 and 3).

As discussed above, the MBB had built-in security that permitted a user to password-protect an individual entry.  Professor McBryan opted to permit the greatest access to his bulletin board by allowing users to create ad hoc entry-by-entry passwords.  McBryan Decl. ¶¶ 24-25.  However, this procedure was simply one of a variety of procedures well known to those of skill in the art for providing data security, all of which are practically interchangeable.  *Id.* ¶ 26.

It would have been obvious to require user-level authorization prior to allowing a user to

---

[6] The analysis is the same for Claim 8, which is an apparatus claim otherwise identical to claim 1.

add an entry to the MBB.  Web servers in 1994 were able to restrict access to all or part of a website using "server authorization."  McBryan Decl. ¶ 26.  Indeed, Professor McBryan used this server authorization feature while developing certain versions of the MBB in 1994 and earlier, in order to protect the code under development from unauthorized access.  *Id.*  Moreover, the MBB already included the ability to check passwords on an entry-by-entry basis to determine whether a user was authorized  to delete or modify a record.  *Id.* ¶¶ 9, 51; App'x A pp. 81-82.  Thus, it would have required a very small number of changes to the MBB software to add a similar mechanism to "determine[] whether a user [was] authorized to add [a] record" in accordance with the claims of the '940 patent.  All that would have been required was a comparison between a user-provided password and the password stored in MBB prior to permitting a user to add an entry.  *Id.*  In short, the change required would have been the simple and obvious change from an open and public system to a closed system using conventional authentication techniques.  *See KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

### 3. The MBB Stored an Identification of the User Who Created the Record, Indicating That the User Has Authority to Modify the Record

The '940 patent require "storing an identification of said user indicating said user is authorized to modify said record in said network accessible database" (element 7).  The password file stored as part of each entry satisfies this limitation because each password file contained both the author's name and the author's password.  McBryan Decl. ¶ 22.  Only by supplying that password could a user delete the entry.  *Id.* ¶ 9; Ex. K.  Thus, the association of the author's password with the entry indicates that the author is authorized to modify the entry.

Professor McBryan's May 1994 MBB Paper pointed out that the MBB "support[ed] a set of modification operations that are accessed through the Add / Change / Delete key at the top of the [MBB] Summary page," allowing a user to "edit a previously created entry, and copy or move a posting to a different location on the" MBB.  McBryan Decl. Ex. C, at 83-84 (also noting that users could submit "requests to edit, move or delete [their] posting[s]").  Likewise, the

version of the MBB discussed in Professor McBryan's video permitted a user to delete an entry

and then add a modified entry to the bulletin board, thereby updating the content of the bulletin

board.  McBryan Ex. R (MBB Video) at 15:23-17:54; 18:27-20:12.  The result of performing

those two steps in sequence was that a modified entry would be stored in the same location as the

original entry, and, as required by the '940 patent, user identification information—*i.e.*, the name

and password the user had previously entered—was used in the course of this process.[7]

Moreover, a user could delete an entry, and deletion is a type of modification or updating.

McBryan Decl. ¶ 11.  Using the Add Entry Form, a user could provide a list of one or more items

to delete, and could delete them provided that the correct password was supplied.  *Id.* ¶¶ 9, 14.

### 4.     The MBB Anticipates or Renders Obvious the Remaining Claim Limitations of the '940 Patent

#### a)     The MBB's Entries Satisfy the "Non-Textual Content," "Image," and "Included in a File" Limitations of the '940 Patent (Claims 2-4 and 9-11)

Claims 2-4 and 9-11 of the '940 patent require storing "non-textual content," "an image,"

and "a file."  An image file satisfies all three limitations—it is non-textual content, an image, and

a file.  The MBB allows a user to create an entry like that depicted in Figure 6 above, which

included images of a cake.  *See* McBryan Decl. App'x A pp. 82-86

As discussed above, the MBB provided methods for users to submit images along with

their entries.  Specifically, the MBB handled images by creating links within each entry to the

relevant image files.  *See supra* Section VI.A.1; McBryan Decl. App'x A pp. 82-86.

#### b)     The MBB Anticipates the "Description of Information" Limitation (Claims 5 and 12)

Users submitted information including "a description of information" by associating their

entries with particular categories.  For instance, by placing an entry relating to "Blueberry Pies"

in the "Pies" subcategory, the user submitted the "description" that the entry related to "Pies."

---

[7] Importantly, the "modify[ing]" process disclosed by the asserted patents involves simply providing the user with the same entry form used to create the entry in the first place, then permitting the user to input brand new information into the form, then replacing the existing data with the new data.  *See* '940 patent, 6:28-34 & Fig. 2P.  There can be no argument that the MBB's method of deleting, then replacing, an entry in order to modify it is not anticipatory—it is the same method taught by the patents in suit.

**c)** **The MBB Displayed the Information Submitted on a Web Page (Claims 6-7 and 13-14)**

As discussed, the MBB displayed entries over the internet by generating HTML web pages. *See supra* Sections VI.A.4; VI.A.5; McBryan Decl. App'x A pp. 87-93.

**5.      Claims 15-21 Have Conclusively Been Held Invalid**

In prior litigation initiated by GraphOn in the Eastern District of Texas, Claims 15-21 were held to be invalid in a claim construction order. *See* Taub Decl. Ex. 5 (Markman Order at 18) ("The court has determined that the three means-plus-function limitations specifically addressed in this order are indefinite. Consequently, claim 15 and all dependent claims depending from claim 15 are indefinite."). This finding acts as collateral estoppel against GraphOn. *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1578 (Fed. Cir. 1994) ("Because its patents are invalid and were determined to be invalid after full and fair litigation, Mendenhall is collaterally estopped from recovering for infringement of those patents in these pending cases.").

**C.      The MBB Invalidates the '034 and '591 Patents**

The '034 and '591 patents generally claim the same elements as the '538 and '940 patents; however, all of the claims of the '034 and '591 patents require receiving a fee from the owner of an entry for making the entry accessible over the network, and many of the claims require an updating functionality, as well as the use of keyword indexing. An illustrative claim is Claim 1 of the '591 patent, which claims:

A method for providing a pay-for-service web site comprising:

[1] providing a web server coupled to a computer network having a database operatively disposed within and accessible on said network;

[2] providing an HTML front-end entry process associated with the web server;

[3] executing an HTML front-end entry process, said HTML front-end entry process being configured to:

[4] create a personal homepage for an owner;

[5] store said personal home page in said database;

[6] index said personal homepage in said database in a user-defined category; and

[7] receive a fee from said owner for making said personal homepage accessible on said network.

The MBB satisfies each of these elements.[8]

       **1.**      **The MBB Used a Web Server Containing a Network-Accessible Database**

As discussed above, the MBB was available over the University of Colorado's network, and relied on a hierarchical file system / database to store entries submitted by users over the network (element 1).  McBryan Decl. App'x A pp. 162-66.

       **2.**      **The MBB Contained an HTML Front-End Entry Process That Permitted Users to Create and Store Personal Homepage Data**

As already described, the MBB permitted users to enter data via an HTML form (elements 2 and 3).  The MBB did not impose any limitations at all on the types of data users could enter.  Users could and did readily use the MBB to create entries containing personal homepage content (elements 4 and 5).  McBryan Decl. ¶ 57.  Simply put, the MBB permitted users to put whatever they liked in their entries, including any data that might be regarded as "personal homepage" data.  This same analysis applies to the "personalized information" referenced in Claims 9-10 and 20-21 of the '034 patent and Claims 9-10 and 20-21 of the '591 patent.  McBryan Decl. App'x A pp. 122-25.

       **3.**      **The MBB Indexed Entries in User-Defined Categories**

As we have previously discussed, the MBB permitted users to associate their entries with either pre-existing categories or create new categories to store their entries (element 6).  The MBB would then store (i.e., "index") entries in these user defined categories.  Indeed the MBB's basic file-storage system identified entries by where they were stored in the category-based file system.  McBryan Decl. App'x A pp. 170-72, 202-04.

       **4.**      **The MBB Renders Obvious the "Receiving a Fee" Limitations**

It would have been an obvious modification to the MBB to charge users for creating entries or rendering those entries accessible (element 7).  *See supra* Section VI.A.6.a; McBryan Decl. App'x A pp. 172, 204.

---

[8] The analysis is the same for Claim 12 of the '591 patent, which is simply a method claim otherwise identical to Claim 1.  Similarly, Claim 1 of the '591 patent is identical to Claim 12 of the '591 patent.

5.     **The MBB Anticipate the "Updat[ing]" Limitations in the Independent Claims of the '034 Patent**

The claims of the '034 patent are nearly identical to those of the '591 patent.  The only difference is that the '034 patent omits the "indexing" limitation (element 6) of claim 1 of the '591 patent and adds a limitation that the "HTML front-end update process [be] configured to allow said owner to update said personal homepage over said network."  *Compare* Claim 1 of '034 patent *with* Claim 12 of the '591 patent.  As discussed above, the MBB permitted such updating both by including an express updating function and by permitting a user to delete, then replace an entry.  *See supra* Section VI.B.3.[9]

6.     **The MBB Satisfies the Remaining Dependent Claim Elements**

a)     **The MBB Allowed a User to Supply Keywords for an Entry ('591 Patent, Claims 5-10, 16-20)**

Claims 5-8 and 16-19 of the '034 and '591 patents require allowing the user to provide "keywords" as part of the entry.  The MBB anticipates this limitation in two ways.  First, text entered into the "Title" field of the Add Entry Form was treated as a series of keywords by the WWWW search engine, which was integrated into the MBB.  *Id.* ¶ 18.  Second, any hypertext words entered into the "body" field of the Add Entry Form were also treated as keywords by the WWWW.  *Id.* ¶ 19.  A user could provide keywords for the entry in either way, and those keywords were stored in the MBB database, within the same file containing the entry.  Thus, the MBB anticipates the "keywords" limitation of the asserted claims.[10]  McBryan Decl. App'x A pp. 181-87, 213-17.

---

[9] In addition to modifications that required the entry of a password, a user could modify the appearance of an entry by changing some of the remotely stored data for the entry, such as an image.  McBryan Decl. Ex. R (MBB Video) at 6:06-6:59; 9:21-10:18; 15:23-17:54; 24:19-24:43.  The entry would reflect the modified image as soon as it was changed in the remote location.  McBryan Decl. ¶ 11.

[10] Certain other claims of the '034 and '591 patents require associating the entry's categories with specific pieces of information within the entry, such as "non-textual information" (claims 3-4 and 14-15 of both patents) and "keywords" (claims 6-8 and 17-19 of both patents).  Because the entire entry was stored within a hierarchical database, any information submitted by the user—including its text, non-textual information such as graphics, and keywords—would automatically be associated with the category and subcategories selected by the user.  The MBB anticipates these claims as well.

b)      **The Remaining Claim Elements of the '034 and '591 Patents Are Subject to the Same Analysis Set Forth Above**

The remaining dependent claims of the '034 and '591 patents simply reiterate claim elements already addressed above.  Claims 2 and 13 of each patent recite that the content provided include "categories of information."  The MBB, as discussed, was based on categories. *See supra* Section II.B.4; McBryan Decl. App'x A pp. 173-75, 205-207.  Claims 10 and 21 of each patent require that the information submitted include "a URL to the user's homepage."  As discussed the MBB permitted users to include any URLs they wished, including URLs of their homepages, in MBB entries. *See supra* Section VI.C.2; McBryan Decl. App'x A pp. 124-26, 220-22.  Finally, Claims 11 and 22 of each patent require "password-protecting said account."  As discussed, the MBB included password protection for entries. *See supra* Section VI.A.3.  A user could use the same password to protect a collection of categories, subcategories, and pages, thus creating an individual user-controlled section of the MBB.  McBryan Decl. ¶¶ 22, 26, 51; App'x A pp. 190-91, 222-23.

In sum, the MBB anticipates or renders obvious all claims of the asserted patents.

**VII.    Conclusion**

For the foregoing reasons, plaintiffs MySpace, Inc. and Fox Audience Network, Inc. request that the Court find that the claims of the asserted GraphOn patents are invalid as anticipated and/or rendered obvious by the Mother of All Bulletin Boards.

DATED:  May 26, 2010                     Respectfully submitted,


                                         COVINGTON & BURLING LLP


                                         By: s/ Kevin B. Collins
                                             Kevin B. Collins

                                         ATTORNEYS FOR MYSPACE, INC., AND
                                         FOX AUDIENCE NETWORK, INC.