1
2
3
4
5
6        IN THE UNITED STATES DISTRICT COURT
7        FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9  MYSPACE, INC.,                          No. C-10-0604 EDL
                                           No. C-10-1156 EDL
10            Plaintiff,                    Consolidated Actions
11       v.
12  GRAPHON CORPORATION,                   **ORDER GRANTING PLAINTIFFS'**
                                           **MOTION FOR SUMMARY JUDGMENT**
13            Defendant.                   **AND DENYING DEFENDANT'S**
   _____/      **MOTION TO STRIKE**
14  CRAIGSLIST, INC.,
15            Plaintiff,
16       v.
17  GRAPHON CORPORATION,
18            Defendant.
   _____/
19
20       This patent infringement case involves technology to enable user-generated and user-
21  controlled content to be published and password-protected on the internet.  On May 26, 2010,
22  Plaintiff MySpace, joined by Plaintiff craigslist, moved for summary judgment, arguing that
23  Defendant's patents-in-suit are invalid as anticipated and obvious.  Specifically, Plaintiffs argued
24  that by April 1994, Oliver McBryan, a professor at the University of Colorado, had a system called
25  the Mother of all Bulletin Boards up and running on the University's servers that provided nearly
26  identical functions to those asserted in the patents.  On August 3, 2010, Defendant filed a motion to
27  strike McBryan's opinions.
28       This matter was reassigned to this Court June 10, 2010.  The Court held a hearing on these

motions on October 1, 2010.  The parties filed supplemental briefs as requested by the Court on

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   October 12, 2010.  For the reasons stated at the hearing and in this Order, Plaintiffs' Motion for

2   Summary Judgment is granted, and Defendant's Motion to Strike is denied.

3   **Background**

4          In the early 1980's, desktop applications proliferated, running entirely on personal computers

5   (PC), and storing all related program code and data thereon.  Declaration of Susan Spielman

6   (Spielman Decl.) ¶ 24.  This process did not scale well into environments larger than financial or

7   inventory programs, and posed dilemmas for software applications.  Id.

8          From the mid-1980's to mid-1990's, companies began centralizing applications on a server

9   so that the programs and data could be accessible across an enterprise or working group.  Spielman

10  Decl. ¶ 26.  This approach allowed data to be shared among multiple users.  Id.  This client/server

11  technology, also known as a 2-tiered system, introduced other issues such as authentication, resource

12  access control, confidentiality and performance metric monitoring.  Id. ¶ 27.  It was a common

13  practice during that time by those skilled in the art of client/server software development to use a file

14  system on a machine that was accessible through the operating system.  Id. ¶ 28.  Thus, a file system

15  was readily available on all kinds of computers because all computers have operating systems.  Id.

16  In the mid-1990's, as network applications continued to advance the client/server or 2-tiered

17  technology, web-based n-tier technologies used previously in a broad range of applications were

18  becoming more popular and functional for the Internet, corporate intranet systems and highly

19  distributed applications.  Spielman Decl. ¶ 30 (stating that the term "n-tier" refers to the number of

20  layers present in a software's architecture, and that web-based software could be up to 5-tier).

21         Prior to the filing of the patents-in-suit, three different models of database structures had

22  been used: hierarchical, relational and network.  Spielman Decl. ¶ 43.  A hierarchical database uses a

23  tree structure, which is a parent-child relationship in which one parent can have many children, but a

24  child can only have one parent.  A network database uses a modified tree structure that allows for a

25  node to be pointed to by more than on parent.  A relational database uses a table structure which is

26  designed to manage and organize large amounts of related data.  Id.  According to Defendant's

27  expert, network databases were rarely used, and hierarchical databases were almost completely

28  abandoned in favor of the more powerful and flexible relational database by the time of the patents-

1    in-suit.  Id.

2    **The patents-in-suit**

3         There are four patents at issue: U.S. Patent Nos. 6,324,538; 6,850,940; 7,028,034; and

4    7,269,591.  All four patents claim priority to an application filed on December 14, 1995.

5    Declaration of Winslow Taub (Taub Decl.) Ex. 1, p.1.  The patents disclose a method and apparatus

6    that enable a user to create, modify and/or search for a database record over a computer network

7    such as the Internet.  Taub Decl. Ex. 1-4.  The inability to control the content of an internet listing

8    motivated the inventors of the patents-in-suit.  See, e.g., Taub Decl. Ex. 1 at 2:20-29; 61-64.

9         Inventors Ralph Wesinger and Christopher Coley, the President and Chief Programmer at

10   Defendant's predecessor, Network Engineering Software, encountered several issues with early

11   search engines such as Yahoo!.  In late 1994 and early 1995, their computer network clients were for

12   the first time connecting to the Internet and creating web pages to make their services and products

13   available to the public via Yahoo!.  Rounds Decl. Ex. 11 at 78, 93-104.  Services such as Yahoo!

14   were "typically attended with a number of drawbacks.  In particular, the person wishing to publicize

15   their Web site typically has very limited control of the content of the resulting listing."  Taub Decl.

16   Ex. 1 at 2:22-25.  The inventors discovered that Yahoo! arbitrarily edited and categorized each

17   listing or database entry, and engaged in this time-consuming process every time a listing was

18   sought to be posted, modified or updated.  Rounds Decl. Ex. 11 at 78, 93-104; see also Taub Decl.

19   Ex. 1 at 2:2:25-34 (stating that search engine owners would exert "editorial control," resulting in a

20   listing "being placed under an entirely different category from the category intended" by the user,

21   and the "textual description may be heavily edited.").  This resulted in typographical errors and

22   listings that were difficult to search.  Id.  Further, "the nature of the listing is rather prosaic" in

23   Yahoo! or other similar services because "[t]he listing is in title/brief description format and does

24   not include graphical elements or otherwise appeal to the artistic sensibilities of the viewer."  Taub

25   Decl. Ex. 1 at 2:40-47.

26        To solve these problems, the inventors designed a system that enabled a computer network

27   user to control the creation and classification of the user's own database entry.  Taub Decl. Ex. 1 at

28   Col. 2:60-3:40; id. at col. 2, Abstract (disclosing a "dynamic information system in which the

*United States District Court*
For the Northern District of California

information content is entirely user-controlled. Requests are received from individual users of the computer network to electronically publish information, and input is accepted from the individual users. Entries from the users containing the information to be electronically published are automatically collected, classified and stored in the database in searchable and retrievable form. Entries are made freely accessible on the computer network. In response to user requests, the database is searched and entries are retrieved.").  Under that system, a user could create an entry or mini-homepage with their own text and graphics, and either choose or create searchable categories that best fit their respective product, service or business.  Id.  The information is made available for viewing by other users, preferably as an HTML file.  Id. at 3:3-7; 3:16-19.  Users could also modify their publicly posted listings simply by accessing their listing in the network accessible database and making changes.  Id.

**The Mother of all Bulletin Boards**

The Mother of all Bulletin Boards (MBB) was developed over several months in Fall 1993 through February 1994 by Dr. Oliver McBryan at the University of Colorado, to "provide the ability to have online Internet catalogues (or bulletin boards) which could grow without any intervention by a webmaster."  McBryan Decl. ¶¶ 7, 36.  McBryan acknowledged the problems associated with web indices that are maintained by one person, for example, that the model would not scale well for millions of computers.  McBryan Decl. Ex. C at 82.  The initial idea for the MBB "came from the realization that the WWW could provide a very powerful tool for cataloguing information of all types," especially if "individual users were free to input their own information and if that information could be categorized according to the user's choosing, even allowing them to create their own categories."  McBryan Decl. ¶ 35.

"Users could access the MBB and either read the information already there provided by others or add information of their own (an 'entry').  The MBB was designed to permit users to create entries wherein each user wholly controlled the information in the entry, the entries were placed by users into the categories (new or existing) to which they pertained, and other users would have access to the entries."  McBryan Decl. ¶ 7.  A user could post an entry in an existing subcategory with a category, or create a new subcategory.  McBryan Decl. ¶¶ 8, 14, 18, 20.  Each entry in the

MBB was given a title by the user.  McBryan Decl. ¶ 8.  Each user had a password to prevent others from deleting the entry.  Id. ¶ 9.  Users could include links to other webpages and images.  Id. ¶ 10.  Entries could be modified.  Id. ¶ 11.  Each entry was formatted as an HTML document, and presented to users in a web browser capable of displaying the HTML documents.  Id. ¶ 12.  At the "Add Entry" screen, a user would be prompted to input the title, text and images, which were accessed from that screen by author name and password.  Id. ¶¶ 14-20.  All of the entries were stored in an online hierarchical database on the computer running the MBB.  Id. ¶ 22.

The MBB was first made available for public use in November 1993.  McBryan Decl. ¶ 37.  By April 1994, tens of thousands of entries had been made in some of the largest databases, and these databases had been accessed more than 100,000 times.  McBryan Decl. ¶ 24.  The "files and directories were stored in a hierarchical structure in the file system of a computer - either the computer running the web server or another computer on  the same network."  Id. ¶ 25.

The MBB could be searched by either of two methods: the WAIS full-text search system or the WWWW, the World Wide Web Worm.  McBryan Decl. ¶ 29.  WAIS was a widely available text search facility for computers that returned HTML answers to queries and was utilized by MBB to index and search all the entries of each MBB database.  Id. ¶ 30.  The WWWW was a search system developed by McBryan in 1993-1994 to provide additional search capabilities for the MBB by both indexing titles and web-oriented information such as URLs in a specific MBB database, and also providing a global search engine that provided access to MBB databases anywhere on the Internet.  Id. ¶¶ 31-34.

Later, it became clear that the MBB needed the support of an editor or editors to ensure that issues, including the posting of objectionable content and possible copyright and trademark violations, did not get out of control.  McBryan Decl. ¶¶ 38-39.  Therefore, the University took the MBB off the web in or about December 1994.  Id. ¶ 39.  For these motions, Plaintiffs have provided a currently operational version of the MBB and WWWW, operating exactly as they existed prior to December 1994 when the MBB was taken offline.

**Claim construction**

Plaintiffs argue that claim construction is not necessary to resolve the motion for summary

judgment because under any reasonable construction, the MBB invalidates the asserted patents.

Defendant, however, argues that construction of the term "database" is essential to Plaintiff's

invalidity argument because the term is used in every one of the asserted claims of the patents-in-

suit.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 997, n.7 (Fed. Cir. 1995) ("A claim

must be construed before determining its validity just as it is first construed before deciding

infringement.").   Defendant also proposes constructions of the terms: "image," "transaction ID,"

and "password protecting."  Plaintiffs concur with Defendant's constructions of the terms

"transaction ID," and "password protecting," and offer their own construction of "image."  Although

the parties originally provided proposed certain constructions for "database" and "image" in their

motion briefing, just before the hearing, the parties proposed modified constructions.

### A.    Legal Standard

In construing claims, the court must begin with an examination of the claim language itself.

The terms used in the claims are generally given their "ordinary and customary meaning."  See

Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); see also Renishaw PLC v.

Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of

the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the

actual words of the claim.").  This ordinary and customary meaning "is the meaning that the terms

would have to a person of ordinary skill in the art in question at the time of the invention . . . ."

Phillips, 415 F.3d at 1313.  A patentee is presumed to have intended the ordinary meaning of a claim

term in the absence of an express intent to the contrary.  York Products, Inc. v. Central Tractor Farm

& Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).

Generally speaking, the words in a claim are to be interpreted "in light of the intrinsic

evidence of record, including the written description, the drawings, and the prosecution history, if in

evidence."  Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir. 2002)

(citations omitted); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir.

2005) (court looks at "the ordinary meaning in the context of the written description and the

prosecution history").  "Such intrinsic evidence is the most significant source of the legally

operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d

1576, 1582 (Fed. Cir. 1996).

With regard to the intrinsic evidence, the court's examination begins, first, with the claim language. See id. Specifically, "the context in which a term is used in the asserted claim can be highly instructive." Phillips, 415 F.3d at 1314. As part of that context, the court may also consider the other patent claims, both asserted and unasserted. Id. For example, as claim terms are normally used consistently throughout a patent, the usage of a term in one claim may illuminate the meaning of the same term in other claims. Id. However, the court may also consider differences between claims as a guide to understanding the meaning of particular claim terms. Id.

Second, the claims "must [also] be read in view of the specification, of which they are a part." Id. at 1315. When the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs. Id. at 1316. Indeed, the specification is to be viewed as the "best source" for understanding a technical term, informed as needed by the prosecution history. Id. at 1315. As the Federal Circuit stated in Phillips, the specification is "the single best guide to the meaning of a disputed term," and "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." 415 F. 3d at 1321.

Limitations from the specification, however, such as from the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do. Altiris v. Symantec Corp., 318 F.3d 1363, 1372 (Fed. Cir. 2003) ("resort to the rest of the specification to define a claim term is only appropriate in limited circumstances"); Teleflex, 299 F.3d at 1326 ("The claims must be read in view of the specification, but limitations from the specification are not to be read into the claims.") (citations omitted). "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification. . . . [A]ttempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." Decisioning.com, Inc. v. Federated Dept. Stores, Inc., 527 F.3d 1300, 1307-08 (Fed. Cir. 2008) (quoting Comark Comm'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998)). There is

therefore "no magic formula or catechism for conducting claim construction," and the court must "read the specification in light of its purposes in order to determine whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Id. (internal citations omitted).

Finally, as part of the intrinsic evidence analysis, the court "should also consider the patent's prosecution history, if it is in evidence." Phillips, 415 F.3d at 1317. The court should take into account, however, that the prosecution history "often lacks the clarity of the specification" and thus is of limited use for claim construction purposes. Id.

In most cases, claims can be resolved based on intrinsic evidence. See Vitronics, 90 F.3d at 1583. Courts generally views extrinsic evidence as less reliable than the patent and its prosecution history in determining how to read claim terms, even though consideration is within the court's sound discretion. See id. at 1318-19. Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language may the court then rely on extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises. See Vitronics, 90 F.3d at 1583 ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper"). "Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction." Phillips, 415 F.3d at 1318. While expert testimony can be useful to a court for a variety of purposes, conclusory assertions by experts are not useful to a court. Id.

**B.    "Database"**

| Plaintiffs' proposed construction | Defendant's modified proposed construction |
|---|---|
| A collection of data that can be stored and retrieved | Relational database, managed by database management system software running on, but separately from, an operating system |

The key issue here is whether a database, as that term is used in the patents-in-suit, consists only of a relational database, or can also include a hierarchical database such as a file system. To begin its analysis, the Court first turns to the claims themselves. Notably, the term "relational" is

United States District Court
For the Northern District of California

not found anywhere in the patent claims or specification, which lends support to Plaintiff's argument that the term "database" is not limited to a relational database as advanced by Defendant.

The term "database" appears in claims 1, 2, 4, 5 and 7 of the '538 patent, claims 1, 8 and 15 of the '940 patent, claims 1 and 12 of the '034 and '591 patents. The claim language recites a database that stores data and later makes the data accessible or retrievable in accordance with its proposed construction. For example, claim 1 of the '538 patent states: "creating a database entry containing information received from a user of the computer network . . . presenting the information to a user in hyper text markup language in response to a user's request." Claim 4 of the '538 patent states: "creating a database entry containing the information submitted [by a user] via the entry form. . . making the entry accessible over the network to other users of the network." Claim 7 of the '538 patent stated: "creating a database entry containing information accepted from a user of the computer network . . . presenting a database entry to the user via hyper text markup language in response to a user selecting one of the entries' universal resource locator." Claim 1 of the '940 patent states: "generating said record with said information; storing said record in said network accessible database." Claims 1 and 12 of the '034 and '591 patents state: "creat[e/ing] and stor[e/ing] personal homepage content in a database for a owner . . making said personal homepage accessible on said network."

Defendant's proposed construction, which defines "database" narrowly as a relational database, would impose limitations that are not present in the claims, and may render language in the dependent claims of the parent patent superfluous. See Taub Decl. Ex. E at 13:4-8 (dependent claim 5 of the '538 patent states: "The method of claim 4, wherein  the interfacing includes invoking code for multiple Common Gateway Interface scripts;" and dependent claim 6 states: "The method of claim 4, wherein said database is a Structured Query Language."). For example, SQL is a feature of relational databases. Taub Decl. Ex. A at 51. Such a reading would violate the principle of claim differentiation. See Uniroyal Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1054-55 (Fed. Cir. 1988). However, it is not entirely clear from a plain reading of the claim language whether "database" as used in the patents-in-suit should be as broadly defined as Plaintiffs propose. Therefore, the court turns to the specification for further guidance.

1    The specification encompasses databases of various kinds rather than only a relational

2    database.  For example, the specification explains: "Pre-existing collections of information,

3    however, such as databases of various kinds, can rarely be placed directly on the Web."  Taub Decl.

4    Ex. 1 at 1:35-37. More importantly, the summary of the invention states that: "entries from the users

5    containing the information to be electronically published are automatically collected, classified and

6    stored in the database in searchable and retrievable form."  Taub Decl. Ex. A at 2:61-3:5.  This

7    language indicates that "various kinds" of databases were intended by the term "database."

8    Defendant argues that "various kinds" as used in the specification means databases of

9    various brands, not various types.  This argument, however, is not supported by language in the

10   specification.  Defendant further argues that the "various kinds" language actually teaches away

11   from a file system because the language does not focus on anything that stores information for later

12   retrieval unlike the construction proposed by Plaintiffs.  Defendant also notes that along with the

13   "various kinds" language, the specification explains how Computer-Generated Imagery (CGI) has

14   emerged as a standard method (Taub Decl. Ex. 1 at 1:41-43), but that CGI was used in the mid-

15   1990's as a way to communicate with databases, and relational databases in particular, not file

16   systems.  Spielman Decl. ¶¶ 33, 58, 61-62.  Defendant argues that therefore, this language from the

17   background section of the specification points to a relational database or at least some kind of

18   database, which it differentiates from a file system.  Spielman Decl. ¶¶ 50-51.

19   The specification contains other language that also weighs against Defendant's narrow

20   definition of database.  For example, the specification states: "Also running, either on the same

21   machine or a network-accessible machine, is a database management system.  Preferably, the

22   database management system supports Standard Query Language, or SQL."  Id. at 4:9-12.   The fact

23   that it is only preferable that the database management system support SQL leaves open the

24   interpretation that a database can be a relational database running SQL, but could also be another

25   kind of database.  Finally, the specification also states that: "The foregoing description is therefore

26   considered in all respects to be illustrative and not restrictive."  Id. at 12:39-40.  This language

27   supports a broader interpretation of database than only a relational one.

28   The abstract of the patent provides further evidence that the term should not be limited to a

1    relational database.  For example, the Abstract from the '538 patent states:

2        Entries from the users containing the information to be electronically published are
         automatically collected, classified and stored in the database in searchable and
3        retrievable form.

4    Taub Decl. Ex. 1 at 1.  Defendant's expert Spielman states that the tasks described above are not

5    capable of being supported by a file system, but can be supported by a relational database, "or at

6    least some type of database."  Spielman Decl. ¶ 58.

7        The figures of the patents-in-suit also support a broader definition of the term than a

8    relational database.  For example, Defendant further points to Figure 1A, which shows server

9    software and the database on top of the server site, which runs a server platform such as the UNIX

10   operating system.  Taub Decl. Ex. 1 at Fig. 1A; 3:64-4:11.  The specification states: "Also running,

11   either on the same machine or a network-accessible machine, is a database management system.

12   Preferably, the database management system supports Standard Query Language, or SQL."  Id. at

13   4:9-12.  Defendant argues that because a file system is not managed by a database management

14   software running on, but separately from, the operating system (Spielman Decl. ¶¶ 21, 55), a file

15   system is not a database under Defendant's construction.  However, this language does not

16   necessarily mean that "database" only describes a relational database as advanced by Defendant.  In

17   fact, Figure 1B shows a system without CGI, yet Defendant argues that CGI is a marker of a

18   relational database.

19       Defendant argues that a person skilled in the art in 1995 would understand that a database

20   management system, as described in the preferred embodiment, manages a relational database.

21   Spielman Decl. ¶¶ 21, 43.  For example, Defendant argues that the patents contain many terms of art

22   for relational databases, such as field (see, e.g., Taub Decl. Ex. 1 at 8:18; 9:47-50), record (see, e.g.,

23   id. at Fig. 2C), and SQL (see, e.g., id. 4:11-12, 25-27).  However, these terms of art appear in the

24   specification as part of the preferred embodiments, not in the claim language, which is more broad.

25   Further, Spielman testified that a database management system and its relational database were

26   referred to collectively as a "database" by those skilled in the art.  Spielman Decl. ¶ 21.  Yet the

27   specification refers to "various kinds" of databases, which cuts against Spielman's opinion.

28   Moreover, the claims and the specification provide for the creation of a transaction ID for entries,

United States District Court
For the Northern District of California

1   which Spielman testified are a standard feature of relational databases, and are not supported by file

2   systems.  Speilman Decl. ¶ 56.  But as described below, the MBB used a transaction ID.

3          In addition, a narrow construction as proposed by Defendant limiting database to a relational

4   database excludes a preferred embodiment of the patent.  Generally, a claim term should not be

5   interpreted "in a way that excludes the preferred embodiment from the scope of the invention. . .

6   Specifically, [the Federal Circuit] has cautioned against interpreting a claim term in a way that

7   excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the

8   intrinsic record."  Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1383 (Fed. Cir.

9   2008).  Here, for example, the detailed description of the preferred embodiments in the '538 patent

10  contains the following:

11          Categories are represented in computer memory in the form of a tree structure.  A
            categories search starts from the root level, with the Categories routine **415**
12          displaying all the categories available at that level, and all  the entries (or up to some
            number of entries) belonging to that level.  The user can click on any category to go
13          to the next level, and can click on any entry to bring up the mini page of the entry.

14  Taub Decl. Ex. a at 11:1-7.  McBryan testified that in using the MBB, "the user would select a

15  category to place the entry into, or could create a new category."  McBryan Decl. ¶ 8.  A

16  hierarchical database, which is used in the MBB, has been defined as "a database in which records

17  are grouped in such a way that their relationships form a branching, treelike structure . . . A

18  hierarchical database is well suited for organizing information that breaks down logically into

19  successively greater levels of detail."  Taub Decl. Ex. D.  Construing "database" as proposed by

20  Defendant would read out this preferred embodiment.

21          Conversely, Defendant's proposed construction attempts to improperly incorporate other

22  limitations from the preferred embodiment that are not in the claim terms, such as importing the

23  concept of SQL into the unmodified term "database."  For example, Defendant's expert Spielman

24  stated that "databases are structured by definition of a schema, to allow for a result set to be returned

25  based on a user's request through an SQL query."  Spielman Decl. ¶ 47.  She also stated: "SQL is a

26  query language that is used to access specifically relational databases.  So, yes, they would equate

27  SQL with a relational database."  Taub Decl. Ex. A at 51.  Finally, she stated: "that's the only way

28  you would use the structured query language to access the relational database is through SQL.  It

was designed specifically for that reason." Taub Decl. Ex. A at 51.  Spielman also opines that there is "not a single line of SQL code present in the MBB source code.  The MBB would therefore have been unable to access an actual relational database in any way."  Spielman Decl. ¶ 63.  Defendant then goes beyond the specification to rely on extrinsic evidence that relational databases use the ACID (atomicity, consistency, isolation, durability) and CRUD (Create Read Update Delete) properties.  Taub Decl. Ex. A at 147.  Plaintiffs respond that the inventors did not claim the use of SQL or a query language, and that they could have done so if they had wanted to.  See Taub Decl. Ex. E ('367 patent, parent of the asserted patents) ("The method of claim 4, wherein said database is a Structured Query Language.").  Thus, the claim language and the specification support a broader construction than that proposed by Defendant.

The Court also considered the extrinsic evidence proffered.  Defendant's expert Spielman testified that a novel aspect of the invention of the '538 patent was that it overcame the limitations of a file system.  Spielman Decl. ¶ 43.  For example, she testified that file systems do not support relational data between files or schemas, do not support transactional operations, or ACID properties, and do not have the ability to prepend to a file or do arbitrary insertion into or deletion from a file, all of which are apparent in the claimed inventions based on the database specific language used in the claims and specification.  Spielman Decl. ¶¶ 39-41, 45-46.

Plaintiffs argue generally that the Court should disregard the Spielman opinions.  Phillips, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").  First, Plaintiffs argue that Spielman describes the differences between file systems and databases without reference to the asserted patents.  Spielman Decl. ¶¶ 38-48.  Also, she relies for this part of the declaration on Wikipedia as it exists now, which does not address the meaning of the claims of the patents from the viewpoint of a person skilled in the art as of 1995.  Id. While the Court will not disregard the Spielman opinions, these points do limit their weight.

There is testimony from Coley, one of the inventors of the '538 patent, in prior litigation in 2007 that he considered a file system to be a kind of database:

> Q. What is your definition of database?
> A. In my definition of database, yes, it was a database. It was a set of files stored on the hard disk of a computer that were accessed in that particular case based on file name, based on some reference identifier.

13

United States District Court
For the Northern District of California

Q. Why did you say depends on my definition of a database?
A. In the work that I do now, database can mean one of several things. In a lot of laymen's terms database is, for example, Microsoft Access program running on a machine. In software programming, a database is anything that stores related or maybe even unrelated portion of database. A file system, the disk for storage on your hard disk, is a database of sorts. And so from a software perspective we think of everything or a lot of things as databases in that.
Q. When you said database of sorts, what does that mean?
A. It's usually -- the usual concept of a database is a file or a set of files that contain lots of pieces of information, lots of records. In the case where I say database of sorts, we had a set of files containing those. So they were separate files. So maybe in some people's concept of database is different, but from the concept they were all within one file system, different records of the data absolutely fits the definition of a database in my mind.

Taub Decl. Ex. C at 80-81.  McBryan states that the MBB uses a "set of files stored on the hard disk of a computer that were accessed . . . based on file name, based on some reference identifier." McBryan Decl. ¶¶ 7-13, 22, 25-26.

Defendant, however, argues that inventor testimony is generally irrelevant to the topic of claim construction (Cordis Corp. v. Boston Scientific Corp., 561 F.3d 1319, 1338 (Fed. Cir. 2009)), although that case addressed inventor testimony in the context of an inventor of a patent-in-suit engaging in seemingly self-serving testimony regarding the allegedly infringing product, unlike here.  Defendant also argues that Coley's testimony regarding databases was in the context of describing the first implementation of what eventually was developed into an embodiment of the invention.  Coley testified that the first incarnation of the invention was simply a set of files on the web, but then evolved into using a database.  Rounds Surreply Decl. Ex. 2 at 77-80.  This does not entirely explain away Coley's testimony that a database could include a file system.  However, as Defendant points out, Coley was not asked what he thought the definition of database was in the context of the patents-in-suit.

Plaintiffs note that Dr. Meier, Defendant's expert in the prior Autotrader.com litigation, which involved some of the same patents at issue in this case, testified that "a database is an organized collection of information," thereby supporting Plaintiffs' construction.  Taub Decl. Ex. B at 37-38.  With regard to two of the patents in suit, Dr. Meier defined "database" as "an organized collection of information that is both a data store and a data source."  Taub Decl. Ex. B at 48-49. Plaintiffs also argue that Meier conceded that the MBB included a database, but his testimony on

14

United States District Court
For the Northern District of California

1   that point is not entirely clear: "You could have a distributed database in  the sense that I've used

2   within the patent with an instance of GENVL and multiple image servers. . . ."  Taub Decl. Ex. B. at

3   155-56.

4           Defendant argues that Meier's testimony is not entitled to much weight in this case primarily

5   because in the Autotrader.com case, Meier was not asked to opine on the definition of the term

6   "database."  Further, he did not provide an opinion as to whether any prior art constituted a database.

7   Rounds Sur-reply Decl. Ex. 3 at 150.  Defendant points out that Meier's testimony about a database

8   outside the context of the patents-in-suit being "an organized collection of information" differed

9   from his definition in the context of the patents.  Defendant also argues that Meier's testimony was

10  that the patents require that transactions are processed reliably and that the MBB did not meet the

11  limitations of claim 1 of the '538 patent.  Rounds Sur-reply Decl. Ex. 3 at 49-50, 151-52.  Defendant

12  argues that the reliability aspect of Meier's testimony is consistent with Spielman's testimony that a

13  database must contain ACID and CRUD properties.  Spielman Decl. ¶ 40, n. 10.  Still, this testimony

14  reinforces the appropriateness of a broader definition of database.

15          Finally, Defendant points out that McBryan could not answer the foundational question of

16  whether the '538 patent related to a relational database.  Rounds Decl. Ex. 10 at 70-71.  McBryan

17  explained that he could not say whether the '538 patent involved a relational database because he

18  thought the major issue was user access to a database, but he stated that elements of the patent could

19  be aspects of a relational database.  Id.  Defendant argues that McBryan could not answer this

20  question because he had testified earlier that he had little knowledge about databases.  See Rounds

21  Decl. Ex. 10 at 71, 98, 112-12. 116-17, 118, 123.  However, McBryan also testified about databases

22  during his deposition.  Id. at 72-73.  In sum, contrary to Defendant's argument, McBryan's

23  deposition does not show a lack of knowledge of databases during the relevant time period; rather,

24  he testified that he last worked in database research fifteen years ago, which is around the relevant

25  time frame of 1995.  Id. at 112.

26          Citing various dictionaries, Plaintiffs also argue that the ordinary meaning of "database" is

27  simply a collection of data that can be stored and retrieved.  Pls.' Reply at 7-8.  For example, the

28  1994 edition of the Microsoft Press Dictionary defined database as: "Loosely, any aggregation of

United States District Court
For the Northern District of California

1    data." Microsoft Press Dictionary at 105 (2d ed. 1994). Further, the Dictionary of IBM and

2    Computing Terminology defined database as of 1994 as: "(1) a collection of data with a given

3    structure for accepting, storing and providing, on demand, data for multiple users." Dictionary of

4    IBM and Computing Terminology at 21 (10th ed. 1994).

5         Defendant's proposed construction is supported primarily by extrinsic evidence in the nature

6    of an expert declaration. Further, Spielman's proposed construction contains many limitations not

7    found in the patents. Specifically, Spielman testified that the term "database" requires substantially

8    all of the nineteen features she identified in exhibit E to her declaration, including SQL language, a

9    database management system and fast user response performance. Taub Reply Decl. Ex. A at 65; id.

10   at 61-65 (Spielman Depo.: "Q: So again, just for the sake of clarity, if one of these features was

11   missing, it would not be a relational database? A: You don't have to have that [feature called support

12   for normalization], but I would say yes to everything else."). Yet, many of these limitations are not

13   supported by language in the patent. Spielman also acknowledged that other types of database

14   systems were in use in the prior art period, including a hierarchical database, which cuts against

15   Defendant's proposed construction. Taub Decl. Ex. A at 152.

16        In sum, and for all the reasons set forth above, the Court adopts Plaintiffs' proposed

17   construction as modified to include "with a given structure." The addition of language regarding

18   structure is supported not only by the claims, which contemplate, among other things, the

19   presentation of a "data entry form to a user with a plurality of categories, wherein the categories

20   have subcategories" (see Taub Decl. Ex. 1 at claim 4), but also by the specification, which states,

21   among other things, that a user "can click on any category to go to the next level" (see Taub Decl.

22   Ex. 1 at 11:5-6). In addition, Exhibit E of Spielman's declaration, which sets out the qualities of

23   Defendant's proposed construction of "database," contemplates a structure. Finally, the dictionary

24   definitions proposed by Plaintiffs support the addition of language regarding structure. At the

25   hearing, counsel indicated that the addition of language regarding structure would not change their

26   arguments regarding "database." Thus, the Court construes "database" as "a collection of data with

27   a given structure that can be stored and retrieved."

28

**United States District Court**
For the Northern District of California

C.      **"Image"**

| Plaintiffs' proposed construction | Defendant's modified proposed construction |
|---|---|
| Data representing a graphic or picture (original)<br><br>OR<br><br>Data displayed as a picture by an output device (as of October 1, 2010) | Binary data representing a graphic or picture (original)<br><br>OR<br><br>Non textual content representing graphics or image (as of October 1, 2010) |

The second proposed constructions above constitute the current constructions proposed by the parties.  The key issue dividing the parties is whether the proper construction of "image" requires non-textual content, such as .jpg files.  Claim 1 of the '538 patent reads: ". . . wherein the information includes data representing text, a universal resource locator, an image, and a user-selected category."  Taub Decl. Ex. 1 at 12:48-51.  Defendant argues that the Court must consider "data representing text" to be distinct from "image," (Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001)) and in that case, a person of ordinary skill in the art would understand an image to be binary data such as a .gif, .jpg,. or similar format defined specifically for graphic images.  Spielman Decl. ¶ 78.  Defendant points to the specification, which states that a database entry need not be limited to "text alone, but may be a complete hypermedia page, including possible graphics or other non-textual content."  Taub Decl. Ex. 1 at Col. 9:12-15.

Plaintiffs argue that the claims use "image" without any qualifier, and the specification does not use the term "binary."  Spielman notes that an ASCII file, which she believes that McBryan refers to as an image, cannot be an image because it is simply data representing text (because an ASCII file consists of characters from the 128-character set defined by the ASCII standard) as referred to in another phrase of the claim.  Spielman Decl. ¶ 78.  The primary support for the "binary" language is Spielman's testimony, which is somewhat conclusory as to what a person skilled in the art at the time would understand "image" to mean.  Plaintiffs, however, have provided no contrary evidence.  Further, the specification describes several ways to add images to the database.  See Taub Decl. Ex. 1 at 9:51-54, 57-61 ("The form may have one or more checkboxes to indicate the desire to include with the entry one or more non-textual elements, such as a graphic

image, etc. . . . .  Non-textual content may be obtained from the user in any of a number of different ways.").  Even though the claim language does not qualify the term "image," this language from the specification supports Defendant's construction.

The term "data representing" in claim 1 is more plainly read to modify "text" only, and not "image."  Defendant's expert has testified that one of ordinary skill in the art would understand that "image" means binary data.  Further, the specification language supports Defendant's construction and would not appear to preclude binary data or content.  Thus, the Court adopts Defendant's proposed construction and construes "image" as "non textual content representing graphics or images."

**C.    "Transaction ID"**

Plaintiffs concur with Defendant's proposed construction of "transaction ID."  Thus, the Court construes "transaction ID" as "a unique identifier for a particular database entry."

**D.    "Password protecting"**

Plaintiffs concur with Defendant's proposed construction of "password protecting."  Thus, the Court construes "password protecting" as "restricting access to the data by means of a password."

**Motion to Strike Opinions and Evidence of McBryan**

Defendant has moved to strike the McBryan opinions on the grounds that McBryan is not qualified as an expert witness and his opinions are based on insufficient data and unreliable methods.  Defendant also argues that Exhibit R to the McBryan declaration is unsworn and prejudicial hearsay and should be excluded.  Plaintiffs oppose the motion.

**A.    McBryan's opinions**

Federal Rule of Civil Procedure 702 governs the admissibility of expert testimony.  The trial court acts as a "gatekeeper" to the admission of expert scientific testimony under Rule 702.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 579-80 (1993).  The court must conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable."  Id. at 589.  This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong). Id. at 592-93; Kennedy v. Collagen Corp., 161 F.3d 1226, 1228 (9th Cir. 1998). "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). The proponent of expert testimony has the burden of proving admissibility pursuant to Rule 702 by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments).

Defendant argues that the patents-in-suit are directed toward database operations, yet McBryan has no experience with database operations. McBryan developed the MBB and the WWWW, which uses a UNIX file system, which is a hierarchical, not a relational, database. McBryan Decl. ¶ 25; Rounds Opp. Decl. Ex. 10 at 29. McBryan has used SQL to access data. Rounds Opp. Decl. Ex. 10 at 26, 35. McBryan testified that he was not familiar with some terms relating to databases, and that he was not an expert in database terminology. Rounds Opp. Decl. Ex. 10 at 26, 79, 94, 118-20. Specifically, Defendant notes that a database schema describes the structure of a database, yet McBryan testified that he could not precisely say what a schema was. Rounds Opp. Decl. Ex. 10 at 118, Further, Defendant notes that a schema defines the database fields and tables, among other things, but McBryan testified that he did not know what a database field was. Id. at 94. As another example, Defendant argues that the ACID properties are a set of properties that ensure that database transactions are processed reliably (Spielman Decl. ¶ 40), yet McBryan was unfamiliar with those properties. Rounds Opp. Decl. Ex. 10 at 123.

Plaintiffs counter that McBryan has the educational and academic qualifications of an expert in the field of the asserted patents. McBryan Decl. ¶ 3; Ex. A. He designed one of the world's first web search engines. Id. ¶ 5. The relevant expertise, as Defendant appears to concede, is knowledge of databases in 1995. McBryan worked with databases in his line of work at the relevant time, although he has not done so in recent years. Taub Decl. Ex. A at 17 (McBryan testified that he used a database management system many times in his work). He testified that: "almost all of my scientific work since about 1980 has -- has involved using computers and -- and storing substantial

1   amounts of data." Taub Decl. Ex. A at 17.  In doing his work, he "was always using some form of

2   database management." Id. at 17.  He worked on a number of web-based applications for accessing

3   data other than the MBB.  Id. at 23.  Plaintiffs argue that Defendant relies on out-of-context

4   questions from McBryan's deposition in which McBryan was not asked about the patents-in-suit.

5   Although those questions reveal some lack of detailed familiarity with database terms in their

6   current usage, the terms used by Defendant's counsel in the deposition (e.g., ACID and CRUD

7   properties) were not part of the patent claims at issue in this case.

8          Moreover, the Court has rejected Defendant's construction of the term "database" as a

9   relational database.  McBryan testified that he has used SQL to access data, and that he used other

10  data languages as well.  Taub Decl. Ex. A at 26, 29.  McBryan testified as to how SQL worked.  Id.

11  at 39.  Further, McBryan testified briefly regarding the differences between file systems and

12  relational databases.  Id. at 72-76.  Defendant notes that while McBryan forgot the precise full text

13  for the acronym SQL (Structured Query Language, not "symbolic query language or something of

14  that sort," as he stated), so did the inventor in the '538 patent.  Taub Decl. Ex. A at 29; Taub Decl.

15  Ex. 1 at 4:12 ('538 patent states: "Standard Query Language").

16         The Court finds that McBryan's testimony is reliable given his experience with databases

17  and relevant to the issues in this case.  Thus, he is qualified to testify as an expert in this case.

18  Defendant's Motion to Strike McBryan's opinions is denied.

19         **B.     Exhibit R**

20         Defendant also seeks to exclude Exhibit R of McBryan's declaration, which is an

21  audio/video demonstration by McBryan of the modified MBB software through a question and

22  answer format.  The video goes somewhat beyond being a multimedia form of McBryan's

23  declaration because it includes questions by Plaintiffs' counsel, some of which are leading, and

24  some comments by counsel.  Defendant was not present for the video recording.  Rounds Decl. ¶ 14.

25

26         The video is more akin to a declaration than a deposition, and McBryan has since filed a

27  declaration stating that he reviewed the videotape of Exhibit R and verified that the statements made

28  and the operation of the MBB described in that exhibit are true and accurate.  See McBryan Decl. ¶

20

42. While the Court is not adverse to video demonstrations by witnesses as a general matter, the Court did not need to consider the demonstration in reaching its decision, so the motion to strike is denied as moot.

**Motion for Summary Judgment**

**A.     Legal Standard**

      **1.     Summary judgment**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56©.  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1          **2.     Invalidity**

2          A patent is presumed valid.  35 U.S.C. § 282.  Invalidity must be proven by clear and

3    convincing evidence.  See i4i Ltd Partnership v. Microsoft Corp., 598 F.3d 831, 848 (Fed. Cir.

4    2010).

5          **a.     Anticipation**

6          A patent claim is invalid as anticipated if "the invention was patented or described in a

7    printed publication in this or a foreign country or in public use or on sale in this country, more than

8    one year prior to the date of the application for patent in the United States, . . . "  35 U.S.C. § 102(b).

9    To anticipate a claim under § 102(b), a prior art reference must disclose and enable each and every

10   element of the claimed invention, either explicitly or inherently.  In re Gleave, 560 F.3d 1331, 1334

11   (Fed. Cir. 2009); Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003)

12   ("Moreover, a prior art reference may anticipate without disclosing a feature of the claimed

13   invention if that missing characteristic is necessarily present, or inherent, in the single anticipating

14   reference.").

15         **b.     Obviousness**

16         "Section 103 forbids issuance of a patent when the differences between the subject matter

17   sought to be patented and the prior art are such that the subject matter as a whole would have been

18   obvious at the time the invention was made to a person having ordinary skill in the art to which said

19   subject matter pertains."  KSR Int'l co. v. Teleflex, Inc., 550 U.S. 398, 406, 417 (2007) (internal

20   citation omitted) (in evaluating obviousness, "a court must ask whether the improvement is more

21   than the predictable use of prior art elements according to their established functions.").  "The

22   question is not whether the combination was obvious to the patentee but whether the combination

23   was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or

24   problem known in the field of endeavor at the time of invention and addressed by the patent can

25   provide a reason for combining the elements in the manner claimed."  Id. at 420.  Further,

26   "[c]ommon sense teaches, however, that familiar items may have obvious uses beyond their primary

27   purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple

28   patents together like pieces of a puzzle."  Id.

22

1    Determination of obviousness under 35 U.S.C. § 103 is a legal conclusion based on

2    underlying facts, including the scope and content of the prior art, differences between the prior art

3    and the claimed invention, the level of ordinary skill in the art and any relevant secondary

4    considerations.  See Power-One v. Artesyn Technologies, 599 F.3d 1343, 1351-52 (Fed. Cir. 2010);

5    Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1324 (Fed. Cir. 2008); In re Kumar, 418 F.3d

6    1361, 1365 (Fed. Cir. 2005).  When the underlying facts are not in dispute, summary judgment is

7    appropriate.  See KSR, 550 U.S. at 427 ("Where, as here, the content of the prior art, the scope of

8    the patent claim, and the level of ordinary skill in the art are not in material dispute, and the

9    obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.").

10   **B.    Discussion**

11          **1.    MBB is prior art**

12          There is no dispute that MBB is prior art.  The first filing date of the asserted patents is

13   December 14, 1995.  The MBB was in public use by at least April 1994, more than one year prior to

14   the date of the application of the asserted patents.  McBryan Decl. Ex. C (MBB paper dated May

15   1994 stating that the MBB had been accessed more than 100,000 times since April 1994); Ex. D

16   (MBB source code archive).  The issue is whether there is a triable issue of fact as to whether the

17   patents-in-suit are invalid as anticipated or obvious based on the MBB.

18          **2.    "Database"**

19          Defendant argues that even under Plaintiff's construction of "database," which the Court has

20   largely adopted as set forth above, there is a dispute of fact as to whether the MBB teaches a

21   database, and contends that the MBB is actually a file system and not a database at all.  McBryan

22   testified in his declaration that:

23          the files and directories for the entries were stored in a hierarchical structure in the
             file system of a computer -- either the computer running the web server of another
24          computer on the same network.  The MBB database system utilized the UNIX file
             system of the computer as its underlying physical database system (physical level).
25          The UNIX file system is a hierarchical database of data files, where files are stored in
             directories and the directories form a directory tree.

26

27   McBryan Decl. ¶ 25.  He also testified that:

28          Each entry in the MBB was given a unique transaction identifier allowing it to be
             retrieved later for viewing or modification.  An entry was assigned an integer  at the

United States District Court
For the Northern District of California

time of its creation, which was unique within the context of the entry's category, and could be used later to delete the entry.

Id. ¶ 26; see also Spielman Decl. ¶ 85 ("In addition, because the MBB stores its categories in a hierarchical way, this tree structure meant that sub-categories would be created within categories."). The MBB has characteristics of a hierarchical database, which has been defined as:

a database in which records are grouped in such a way that their relationships form a branching, treelike structure . . . A hierarchical database is well suited for organizing information that breaks down logically into successively greater levels of detail.

Taub Reply Decl. Ex. D at 197; McBryan Decl. ¶ 8 (explaining treelike structure of MBB). Plaintiffs note that one of the preferred embodiments of the patents-in-suit describes a hierarchical structure: "Categories are represented in computer memory in the form of a tree structure." Taub Decl. Ex. 1 at 11:1-7.

Defendant relies on its expert Spielman's testimony that the MBB is designed to use a file system, not a database, and a file system is not a database. Spielman Decl. ¶¶ 50-51. Defendant also points to McBryan's testimony that MBB's file system is only managed by the server computer's operating system (McBryan Decl. ¶ 25), but under the construction of "database" adopted by the Court, the management of the file system would not preclude a finding that the MBB is a database.

Next, Defendant points to McBryan's testimony in which he states that the files for the MBB were stored in a hierarchical catalogue or structure, "somewhat like a tree." McBryan Decl. ¶¶ 5, 25; Rounds Opp. Decl. Ex. 10 at 85-86. Spielman testified that a tree structure was similar to files saved on a computer in an application like Microsoft Word, not the multi-dimensional structure disclosed in the patents-in-suit. Spielman Decl. ¶¶ 23, 39, 42-44. Spielman testified that when a user searches on the MBB, the search is performed by opening and closing each and every file in the file system through use of the operating system and then listing the content of files containing the search term. Spielman Decl. ¶ 47, 66-70. Spielman testified that this time-consuming process is distinct from the process used in the patents-in-suit, which use a database management system rather than an operating system to obtain results. Id. She also testified that file systems do not support SQL (Spielman Decl. ¶ 47), but as described above, the claims do not require SQL. Spielman also

states that all databases support ACID and CRUD properties.  See, e.g., Spielman Decl. ¶ 45 ("At the time of the patents, any database would have been required to support transactional operations and have ACID properties.")  Defendant notes that McBryan testified to functions that do not satisfy these properties.  See, e.g., Rounds Opp. Decl. Ex. 10 at 113-15 (when a user attempts to perform a function on the MBB that cannot be performed because of a file system error, the MBB could result in a corrupt file); Spielman Decl. ¶ 40, n. 10 (stating that ACID properties guarantee that database transactions are processed reliably).  But as addressed above, the Court has not adopted Defendant's proposed construction of database as a relational database with these properties.

Plaintiffs have provided clear and convincing evidence that the MBB is a database as that term has been construed.  Thus, there is no a triable issue of fact as to whether the MBB is a database.

### 3.      "Image"

The Court has construed the term "image" as "non textual content representing graphics or images."  There is no dispute that the MBB entry form allowed users to type in the internet address of any image, as well as allowed users to add images to their entries by sending them to McBryan and having him add them to their entries.  McBryan Decl. ¶¶ 12-16, 22.  The method of uploading images by transferring them through another channel is stated in the preferred embodiments: "Non-textual content may be obtained from the user in any of a number of different ways.  For example, the user may transfer to the site a file containing the non-textual content using the File Transfer Protocol with the same user ID and password as when  the entry was added."  Taub Decl. Ex. 1 at Col. 9:56-61.

Defendant argues that an entry for an image on the MBB is nothing more than an HTML link to, or address for, an image that is hosted on a different system, and is not an image.  Spielman Decl. ¶ 77; McBryan Decl. ¶¶ 12-13.  Spielman determined that the MBB had no facility to upload, host or incorporate image data into the MBB.  Spielman Decl. ¶ 77.  Nor is there any place on the entry form to upload an image.  McBryan Decl. Ex. F at F-5.  McBryan, however, testified that he accepted images from users "to be stored on the MBB server."  McBryan Decl. ¶ 16.  Further, as described above, the specification describes several ways to add images to the database, one of

United States District Court
For the Northern District of California

1    which could be to give those images to an editor such as McBryan for uploading to the system.  <u>See</u>

2    Taub Decl. Ex. 1 at 9:51-54, 57-61 ("The form may have one or more checkboxes to indicate the

3    desire to include with the entry one or more non-textual elements, such as a graphic image, etc. . . . .

4    Non-textual content may be obtained from the user in any of a number of different ways.").

5           Even assuming a triable issue of fact as to whether the MBB provided for uploading of

6    images as that term has been construed, and thus satisfied the test for anticipation, Plaintiffs argue

7    persuasively that it would have been obvious to modify the MBB to include automated upload.

8    McBryan Decl. ¶ 56 ("The MBB already provided the ability for a user to enter a path to an image,

9    and to have that image displayed on an MBB page. It would have been straightforward to retrieve

10   the image at the path specified by the user, and to store a copy of that image in the MBB database.

11   The WWWW search engine already included a process that retrieved and downloaded content from

12   other web pages. It would have been straightforward to use the same functionality to retrieve an

13   image from a user-specified location."); ¶ 59 (stating that with regard to the '034 patent, it would

14   have been obvious to add the ability to download an image to a server).  Further, McBryan states

15   that the text of an entry on the MBB could "also include references to image files that would be

16   displayed when the entry was viewed."  McBryan Decl. ¶ 10; <u>see also</u> McBryan Decl. Ex. I (emails

17   providing examples of users adding images to entries in the MBB).  Defendant's expert does not

18   dispute this.  Defendant's expert Spielman states generally in her declaration that the MBB does not

19   make obvious any of the claims in the patents-in-suit.  Spielman Decl. ¶¶ 18, 101.  However, she

20   does not specifically address the obviousness of storing an image in the MBB, instead confining her

21   opinions regarding the "image" language in the claims to whether the MBB anticipated that element.

22   Spielman Decl. ¶¶ 75-79.

23          Thus, even if the MBB did not anticipate the image element, the Court concludes based on

24   the undisputed facts that it would have been obvious to modify the MBB to include automated

25   uploading.  Thus, there is no triable issue of fact as to whether the MBB satisfies the "image"

26   language in the patents-in-suit.

27          **4.     "Transaction ID"**

28          The Court has adopted the parties' agreed-upon construction of "transaction ID" as

26

1    "generating a unique identifier for a particular database entry."  An illustrative claim is claim 1 of

2    the '538 patent:

> 1.  A method of publishing information on a computer network comprising the steps of:
> . . .
> generating a transaction ID corresponding to the database entry;
> . . . .

6    Taub Decl. Ex. 1 at 12:45-46; 52-53.

7       Plaintiffs have provided evidence that the MBB generated a unique identifier for a particular

8    database entry.  McBryan Decl. ¶ 26 ("Each entry in the MBB was given a unique transaction

9    identifier allowing it to be retrieved later for viewing or modification."); Taub Decl. Ex. G at 186

10    ("At any given time, the same number was never used for two entries.").

11       Defendant, however, points to Spielman's testimony that file systems cannot use transaction

12    IDs.  Spielman Decl. ¶ 56 ("Transaction IDs are a standard feature of relational databases.  File

13    systems, however, do not support transaction IDs.").  However, the agreed upon construction does

14    not tie transaction ID to a requirement of a valid transaction.  Instead, the construction ties it to a

15    database entry.  Defendant's argument appears to hinge on its proposed very narrow construction of

16    "database," which has not been adopted.

17       Defendant also points to McBryan's testimony that a file in the MBB could share the same

18    transaction number as another file, and so that transaction number, even if it is a transaction ID for

19    purposes of the patents-in-suit, is not unique.  McBryan testified that:

> Q:  . . . well over time, the same number could be used for two separate --
> A:  Yes.
> Q:  -- users, correct?
> A:  Much like a Social Security number where is somebody dies, that Social Security number may be recycled to somebody sometime in the future, but not probably right away.
> Q:  Okay.  So the —
> A:  Or a telephone number.
> Q:  So the MBB can -- it recycles in some situations a transaction number?
> A:  In some situations, yes,  Not -- not in all situations.  But at -- any given time all entries had a unique number.

26
27    Taub Decl. Ex. G at 186.  Significantly, however, the specification of the patents-in-suit contemplate

28    that unique transaction IDs are "to be used throughout the life of the entry."  Taub Decl. Ex. 1 at

   9:32-33.  McBryan testified that entries on the MBB maintain the same transaction ID number for

the life of the entry, Taub Decl. Ex. 1 at 9:32-24, and Defendant has not pointed to any evidence that two entries on the MBB had the same transaction ID numbers at the same time.  Thus, Plaintiffs have provided clear and convincing evidence that the MBB generated a unique transaction identifier for a particular entry, and there is no triable issue of fact on that issue.

### 5.   "Password protecting"

The Court has adopted the parties' agreed-upon construction of the term "password protecting" as "restricting access to the data by means of a password."  The agreed construction of "password protecting" does not require that the system require passwords in all instances, or that the system restrict access by all other users.  Further, a claim limitation can be invalidated by a single public use.  Coffin v. Ogden, 85 U.S. 120, 124-25 (1873); Eolas Techs, Inc. v. Microsoft Corp., 399 F.3d 1325, 1334 (Fed. Cir. 2005) (finding that a single prior use invalidates both system and method claims).  Moreover, the PTO stated in a non-final office action rejecting claims 1-22 contained in the patent application 10/844,260 that later became the '591 patent at issue in this case, that password protecting is "notoriously old and well known in the art," which indicates that password protecting would have been an obvious modification.  Taub Decl. Ex. H at 5.

Plaintiffs have provided evidence that the MBB protected individual entries, subcategories and categories with a user-supplied password.  McBryan Decl. ¶ 9 (stating that he frequently had to manually delete entries created by users who forgot their passwords); Taub Decl. Ex. G at 175-76 (noting that some users provided passwords).  McBryan stated:

> Along with the user-supplied title, the user provided a password of his choice to prevent others from deleting the entry. The user also provided a password of his choice to prevent deletion of any categories and subcategories that he created. By password protecting a category and all of its subcategories and entries, a user could create an entire section of a bulletin board under his personal editorial control. In this case, only a system administrator could delete any of the categories, subcategories, or entries. Frequently users forgot the password they used and had to ask me to delete their entry at a later date.

McBryan Decl. ¶ 9; id. at ¶ 45, Ex. K (email indicating users applied passwords to entries).  Defendant does not dispute that the MBB used a password to restrict access to entries.  However, Defendant argues that there is evidence that even if a password were created, there were situations where the MBB would accept entries without a password and situations in which a file could be

**United States District Court**
For the Northern District of California

1   deleted by a different higher user without inputting the password used to create the file.  Rounds

2   Opp. Decl. Ex. 10 at 176 (stating that the system would accept a zero length password, but that it

3   would be simple and obvious to alter the code to require a password); 180-81 (stating that if

4   someone did not use a password, another user could come in and delete the entry); Spielman Decl.

5   ¶¶ 84-85 (confirming that the MBB would accept a null password and that non-password protected

6   entries could be deleted by others); McBryan Decl. Ex. F at F-13 (stating that it is advisable to use a

7   password).  But Plaintiffs have provided clear and convincing evidence that at least one user of the

8   MBB used a password to restrict access to an entry, and there is no triable issue of fact on that issue.

9

10          **6.      Charging element**

11          It is undisputed that the MBB did not charge a fee, so the MBB does not anticipate that claim

12   language of the patents-in-suit.  See, e.g., Taub Decl. Ex. 1 at Claim 2 ("The method of claim 1,

13   wherein the user is charged for the creation of the database entry."); id. at Claim 3 ("The method of

14   claim 2, wherein the charge is applied to a user's credit card."); Taub Decl. Ex. 3 at Claim 1 ("A

15   web server for providing a dynamically-updating pay-for-service web site comprising: a web server

16   coupled to a computer network having a database operatively disposed within and accessible on said

17   network, said server comprising: an HTML front-end entry process configured to: . . . receive a fee

18   from said owner for making said personal homepage accessible on said network . . . ."); Taub Decl.

19   Ex. 4 at 12:57-13:4 ("A method for providing a pay-for-service web site comprising: [1] providing a

20   web server coupled to a computer network having a database operatively disposed within and

21   accessible on said network; [2] providing an HTML front-end entry process associated with the web

22   server; [3] executing an HTML front-end entry process, said HTML front-end entry process being

23   configured to: [4] create a personal homepage for an owner; [5] store said personal home page in

24   said database; [6] index said personal homepage in said database in a user-defined category; and [7]

25   receive a fee from said owner for making said personal homepage accessible on said network.").

26   Plaintiffs, however, argue that it would have been obvious to modify the MBB to charge a fee.

27   McBryan Decl. ¶ 49 ("In 1994, when the MBB was operational, it was well-known how to collect

28   information that would allow charging a user for use of a website, and it would have been very

29

straightforward to include this functionality on the MBB site. For example, the registration page for the WWW1994 conference, at which I presented my paper on the MBB, included a form for submitting credit card information in order to secure registration for the conference."). Further, the patents-in-suit show that it was well-known in the art for users to pay a fee for listings on the web. Taub Decl. Ex. 1 at Col. 2:14-18; 10:11-15. For example, McBryan states that the conference where the MBB paper was presented charged a fee online. McBryan Decl. Ex. Q. Defendant has not provided any evidence to the contrary sufficient to raise a triable issue of fact.

Thus, Plaintiffs have provided clear and convincing evidence that the charging element of the patents-in-suit was obvious at the time of the MBB and the patent applications.

### 7.    "Update"

The Court was not asked to construe this term. Although the parties do not dispute that the MBB provided a way to modify or update an existing entry, Defendant argues that the method used in the MBB does not meet the update claim element. Specifically, Defendant argues that because the MBB is a file system, it cannot write data into the middle of a file and the only way to change an item on the MBB is to delete and then recreate the file with modified data. Spielman Decl. ¶¶ 71, 92. Defendant argues that this delete/recreate process fails to meet the "update" element, which contemplates the ordinary meaning of the term update where the existing entry's contents are being modified. Spielman Decl. ¶ 92. Defendant's expert opines that the MBB's delete/recreate process cannot anticipate the update limitations because the MBB entry is not actually modified, but instead replaced. Spielman Decl. ¶¶ 72, 92. Specifically, while an entry in the MBB could include pointers to content hosted elsewhere, the MBB's entry is not modified by changing the content to which the pointer points. Spielman Decl. ¶ 93.

Plaintiffs argues that the patents describe an updating function that is like that employed by MBB, which includes overwriting the prior data with new data using the same entry form. See Taub Decl. Ex. 3 at Fig. 2P. There is nothing in the patent claims that requires the updating of an existing entry to be carried out in any particular manner. The specification describes the update process, but the language there does not appear to require any particular updating method. Taub Decl. Ex. 2 at 6:27-34 ("When the user has edited the entry to his or her satisfaction, the user presses UPDATE.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  The user is then presented with a further page like that shown in FIG 2Q and 2R, giving him or her

2  the opportunity to review one final time the comments and keywords.  To change the comments or

3  keywords, the user presses BACK.  The user can also change the category of the entry by pressing

4  the Change category button.  To accept and complete the update, the user presses a Done update

5  button.").  Plaintiffs also note that Spielman testified that the MBB did perform updates to the extent

6  that it could on an operating system on a file system.  Taub Decl. Ex. A at 101.

7          Further, Plaintiffs argue that providing an update function would have been obvious, and was

8  in fact included in development versions of the MBB prior to the dates of the asserted patents.  Taub

9  Decl. Ex. G at 187 ("A: In my own experimental version I had an editor, the UNIX editor that was

10  brought up and it allowed you to change the information and then store it back in.").  McBryan also

11  testified that there is a reference to this functionality in the source code.  Id. at 188 ("there is a

12  residue in the code where it's still there if you look at the code.  You'll see that there's the edit line

13  still in there.").  Defendant argues that an experimental non-working function cannot be an

14  anticipating reference because a reference "must enable that which it is asserted to anticipate."  Elan

15  Pharma. v. Mayo Found., 346 F.3d 1051, 1054 (Fed. Cir. 2003) ("Enablement requires that 'the

16  prior art reference must teach one of ordinary skill in the art to make or carry out the claimed

17  invention without undue experimentation.'") (quoting Minnesota Mining and Manufacturing Co. v.

18  Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002)).  However, Defendant's enablement argument

19  does not negate obviousness.

20          Thus, Plaintiffs have provided clear and convincing evidence that the MBB invalidates the

21  "update" element of the '034 patent either by anticipation or obviousness.

22  **Conclusion**

23          For the reasons stated above, Plaintiffs' Motion for Summary Judgment is granted.

24  Defendant's Motion to Strike is denied.

25

26

27

28

31

**United States District Court**
For the Northern District of California

1

**IT IS SO ORDERED.**

2

Dated: November 23, 2010

_Elizabeth D. Laporte_
_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28